UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

CASE NO.: 05-11594 RCL
Honorable Reginald C. Lindsay

GERALDINE FAVALORO, for herself and on )
behalf of all others similarly situated, )
    Plaintiff, )
)
)
vs. )
)
)
PRESIDENT AND FELLOWS OF HARVARD )
COLLEGE, BAYVIEW CREMATORY, LLC, )
a New Hampshire Limited Liability Company, )
LINDA STOKES, TRUSTEE OF THE DEKES )
REALTY TRUST OF 107 SOUTH )
BROADWAY, LAWRENCE, )
MASSACHUSETTS, and JOHN J. GENTILE, )
    Defendants )

MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT,
JOHN J. GENTILE, FOR DISMISSAL OF COUNT III (NEGLIGENCE); AND THE
ALLEGATIONS AGAINST HIM IN COUNT IV, (NEGLIGENT INFLICTION OF
EMOTIONAL DISTRESS) AND COUNT V, (RECKLESS AND/OR INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS)

Defendant, John J. Gentile, ("Mr. Gentile") submits this memorandum of law in support of his motion to dismiss.

A.    FAILURE TO VERIFY A BUSINESS LICENSE IS NOT A RECOGNIZED CAUSE OF ACTION IN MASSACHUSETTS

Count III, alleges Mr. Gentile "arranging, as the agent of Harvard, for the cremation of bodies donated to Harvard Medical School's Anatomical Gifts Program" (Para. 70) had a duty to determine if "Bayview Crematory was properly authorized…" (Para. 73) and that the alleged failure to do so left Ms. Geraldine Favaloro ("Ms. Favaloro") with the "suspicion or belief" (Para. 94) that her mother's[1] body may have been mishandled at Bayview. Count IV alleges "negligent acts…[in the] disposition of the loved one…" (Para., 87), but makes no specific

---

[1] Betty L. Frontiero ("Ms. Frontiero")

allegations against Mr. Gentile, instead "realleg[ing]" Mr. Gentile failed to determine "Bayview's authorization to conduct business as a crematory…" (Para. 80). Count V, like Count IV, makes no specific allegations against Mr. Gentile, realleges a failure to verify Bayview's business license, and acknowledges Mr. Gentile's efforts on behalf of Harvard Medical School's Anatomical Gifts Program were a "recognized service to humanity…" (Paras. 86 and 96).

Massachusetts does not recognize a common law or statutory duty to verify a business license. There are no cases or statutes providing for the recovery of personal injuries for failure to verify a business license. Even statutes requiring driver's license verification by car rental companies do not give rise to a common law duty. Nunez v. A & M Rentals, Inc. 63 Mass. App. Ct. 20, 25-26 (2005) (statutory duty to affirm possession of a driver's license did not imply, or give rise to, common law duty to verify license was currently valid, or remained valid, during lease period). Accordingly, Ms. Favaloro's claims against Mr. Gentile do not state a cause of action.

B.  UPSET AND GRIEF ARE NOT RECOVERABLE EMOTIONAL DISTRESS DAMAGES

Ms. Favaloro allegedly became "suspicious" that her mother's remains may not have "been preserved as desired." (Para. 94). When Ms. Favaloro allegedly became "suspicious", how she was physically affected by her suspicions, and what specific medical malady she suffered, are all absent from the complaint. Instead, Ms. Favaloro allegedly experienced unspecified "significant physical consequences." (Para. 87). Objective corroboration, not subjective significance, is necessary to recover emotional distress damages. Payton v. Abbott Labs, et al, 386 Mass. 540, 556 (1982). Assuming, arguendo, that there is a legally cognizable causal connection between Mr. Gentile verifying a business license and Bayview's alleged mishandling of Ms. Frontiero's body, and assuming that "suspicion" of mishandling is

2

actionable, Ms. Favaloro's anger, grief and upsetment, are not recoverable damages. Sullivan v. Boston Gas Co., 414 Mass. 129, 137 (1993). The types of symptoms courts have found to be sufficient proof of emotional distress are the collection of symptoms which can be associated with post traumatic stress disorder, such as headaches, concentration problems, and sleeplessness, or other concurrent, multi-systems such as stomach pain, and nausea, body shakes and reduced libido. Sullivan, 414 Mass. at 140.

Ms. Favaloro's mother passed away on February 12, 2004. (Para. 12). Her remains were cremated nine months later on November 9, 2004. (Para. 25). Ms. Favaloro received her mother's cremated remains shortly thereafter. (Para. 27). Ms. Favaloro does not allege when she first became sick due to her "suspicions", her actual maladies or any diagnosis or treatment by medical professionals. Without allegations of physical harm, " 'objectively evidenced', and substantiated by expert medical testimony", Sullivan, 14 at 137, (and cases cited), Ms. Favaloro does not allege recoverable damages.

C.   MR. GENTILE'S ALLEGED CONDUCT WAS NOT "EXTREME AND OUTRAGEOUS" AND THEREFORE CANNOT SUSTAIN AN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

Count V alleges intentional infliction of emotional distress as to "all defendants". However, Count V does not allege Mr. Gentile engaged in any "extreme and outrageous" conduct. Plaintiff merely alleges Mr. Gentile, acting as Harvard's agent, arranged for cremation of Ms. Frontiero's body at Bayview. (Para. 23) The pre-printed Harvard University form, signed by Mr. Gentile as Harvard's agent, and co-signed by Samuel Kennedy and Cynthia McDermott, both Harvard officials, is Exhibit "G" to the plaintiff's complaint. Ms. Frontiero's cremated remains were returned to Harvard, by Bayview, on November 16, 2004. (Para. 26). The pre-

3

printed receipt form, signed by Harvard's "authorized representative", Cynthia McDermott, is Exhibit "J" to plaintiff's complaint.

Nowhere in the plaintiff's complaint, nor on any Harvard or Bayview pre-printed form, is there any information to suggest Mr. Gentile participated, in any fashion, in how Ms. Frontiero's body was handled at Bayview. Thus, the sole premise for the plaintiff's intentional infliction of emotional distress claim is what Mr. Gentile allegedly knew, or didn't know, about how Bayview operated <u>before</u> Ms. Frontiero's body was sent to Bayview. However, the plaintiff does not allege Mr. Gentile had any knowledge Bayview was mishandling bodies. In fact, the plaintiff alleges the opposite, namely that Mr. Gentile had no idea how Bayview was operating. As to Mr. Gentile, the plaintiff's "core issue" is his alleged "failure…to make even the slightest investigation or determination of Bayview's authorization to conduct business as a crematory…". (Para. 42) Even if true, which Mr. Gentile denies, negligent failure to verify a business license is not "extreme and outrageous" conduct, beyond the bounds of decency in a civilized society, so as to be actionable under a theory of intentional infliction of emotional distress. <u>Quinn v. Walsh</u>, 49 Mass. App. Ct. 696, 706 (2000) (affirming dismissal for failure to state a claim). Accordingly, Count V should be dismissed as to Mr. Gentile.

D. <u>AS A MATTER OF LAW, THE BROAD SCOPE "GOOD FAITH" IMMUNITY Of G.L. C. 113, §13 (c) BARS THE ALLEGATIONS AGAINST MR. GENTILE</u>

For the last thirty-five years, G.L. c. 113, §§ 7-14, part of Chapter 113 entitled "Promotion of Anatomical Science", has governed donation of bodies to Massachusetts medical schools for the advancement of science and learning. G.L. c. 113, §§ 7-14 contain the Uniform Anatomical Gift Act (1968) adopted by Massachusetts, along with twenty-eight other states. <u>Carey v. N.E. Organ Bank</u>, 2004 WL 875623 (Mass. Super at Pg. 4) (***Exhibit "A"***).

G.L. c. 113, §13(c) reads:

> A person who acts in good faith in accordance with the terms of sections seven to thirteen, inclusive, or under the anatomical gift laws of another state or a foreign country shall not be liable for damages in any civil action or be subject to prosecution in any criminal proceeding for his act.

The term "person" is defined in G.L. c. 113, §7, as:

> "Person", an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association or any other legal entity.

Mr. Gentile, an "individual", is a "person" as defined by G.L. c. 113, §7. All of Mr. Gentile's alleged wrongdoing arose out of his actions, as Harvard's agent, in arranging for the disposition of Ms. Frontiero's body. (Para. 23, Exhibit "G" to complaint). G.L. c. 113, §13(c) provides "good faith" immunity to "[a] person who acts in accordance with the terms of sections seven to thirteen, inclusive…" stating that such a person "shall not be liable for damages in any civil action…" G.L. c. 113, §13(a), part of "sections seven to thirteen, inclusive", specifically includes actions relative to "the disposition of the body…" Accordingly, it is crystal clear that plaintiff's allegations against Mr. Gentile fall squarely within the "good faith" immunity from civil liability provided by G.L. c. 113, §13(c).

The application of "good faith" immunity is a "matter of law" for this court. See Carey v. N. E. Organ Bank, 2004 WL 875623 (Mass. Super at Pg. 4). "Good faith" pursuant to §13(c) is an "honest belief, the absence of malice, and the absence of design to defraud or to seek an unconscionable advantage." Carey at Pg. 5, quoting Nicoletta v. Rochester Eye and Human Parts Bank, 529 N.Y. S. 2d. 928 (N.Y. Sup., Sept. 18, 1978). In Massachusetts, policy reasons compel a broad application of good faith immunity. Carey at Pg. 8. The Carey court noted that other "courts have applied the good faith immunity provision liberally,…" Id. The Carey court,

5

holding that good faith immunity barred the plaintiff's claim, also noted that "plaintiffs have failed to advance specific facts sufficient to establish the existence of a genuine issue of material fact as to the defendants' lack of good faith…" Id. At 9.

In this case, the plaintiff's "core" allegation against Mr. Gentile is that he failed to determine if Bayview was licensed to perform cremations. (Para. 42). Given the broad scope of immunity under §13(c), to state a claim the plaintiff would have to allege Mr. Gentile, acting in "bad faith", knew Bayview was unlicensed and kept the knowledge a secret, to the plaintiff's detriment. However, no such theory is plead and such a theory would be antithetical to the plaintiff's negligence theory. Accordingly, Count III, and Counts IV and V as to Mr. Gentile, all fail to state a claim, given the broad scope of "good faith" immunity provided by G.L. c.113, §13(c).

E.   NOT ALLEGING MR. GENTILE ACTED IN BAD FAITH, THE PLAINTIFF HAS NO BASIS FOR SEEKING DISCOVERY AGAINST MR. GENTILE

As to Harvard and Mr. Gentile, Ms. Favaloro alleges that their purported "failure…to make even the slightest investigation or determination of Bayview's authorization to conduct business as a crematory, ….. are the core issues in this case which present issues of fact and law that predominate over all other issues in this matter." (Para. 42) Accepting plaintiff's allegation as true, for purposes of this motion only, the plaintiff has failed to allege "bad faith", a necessary element of her claim, given the "good faith" immunity accorded by G.L. c. 113, §13 (c). Dismissal under Fed.R.Civ.P. 12 (b)(6), based on an affirmative defense, is appropriate where the defense is clear from the plaintiff's allegations. In Re: Colonial Mortgage Banking Corp., 324 F.3d 12, 16-20 (1st Cir. 2003). Similarly, litigants are not permitted to assert contradictory positions to avoid dismissal. Id. at 18 (and cases cited). Ms. Favaloro, having staked her claim on Mr. Gentile's alleged failure to know enough about Bayview's operation, cannot now switch

horses and allege Mr. Gentile knew too much about Bayview's operation. Moreover, where a plaintiff lacks a minimal basis for allegations of bad faith, discovery "in the hopes of somehow finding something helpful..." is not appropriate, nor countenanced. E. A. Miller, Inc. v. South Shore Bank, 405 Mass. 95, 102 (1989) quoting Charbonnier v. Amico, 367 Mass 146, 153 (1975). The plaintiff's "core" allegation against Mr. Gentile is that he failed to confirm Bayview had a crematory license. (Para. 42). The plaintiff does not allege Mr. Gentile acted in bad faith. Accordingly, the plaintiff has no basis, let alone a minimal basis, for seeking discovery against Mr. Gentile. Therefore, G.L. c. 113, §13(c) bars Count III, and Counts IV and V as to Mr. Gentile, making dismissal as to Mr. Gentile appropriate.

F.   CONCLUSION

For all the above-stated reasons, the defendant, John J. Gentile, respectfully requests that this Honorable Court order that the plaintiff's claims against Mr. Gentile, specifically Count III, and the allegations against him in Counts IV and V, be dismissed.

Respectfully submitted,

*/s/ Douglas A. Robertson*
Douglas A. Robertson, B.B.O. No. 552315
Sean D. Ferrill, B.B.O. No. 654173
Attorneys for John J. Gentile
MARTIN, MAGNUSON, MCCARTHY &
    KENNEY
101 Merrimac Street
Boston, MA 02114
(617) 227-3240

## CERTIFICATE OF SERVICE

I, Douglas A. Robertson, attorney for John J. Gentile, hereby certify that on the 16th day of August, I served a copy of the above document, via first-class mail, postage prepaid to:

Lisa DeBrosse Johnson, Esq.
The Pilot House
Lewis Wharf
Boston, MA 02110

William F. Ahern, Jr., Esq.
Mandi J. Hanneke, Esq.
Clark, Hunt & Embry
55 Cambridge Parkway
Suite 401
Cambridge, MA 02142

Donald R. Frederico, Esq.
McDermott Will & Emery, LLP
28 State Street
Boston, MA 02109

Andrew R. Schulman, Esq.
Getman, Stacey, Schulthess & Steere, P.A.
3 Executive Park Drive, Suite 9
Bedford, NH 03110

William P. Smith, Esq.
Haverty & Feeney
54 Samoset Street
Plymouth, MA 02360

David H. Charlip, Esq.
Charlip Law Group, Inc.
Harrison Executive Centre
1930 Harrison Street, 208
Hollywood, FL 33020-5018

Respectfully submitted,

Douglas A. Robertson, B.B.O. No. 552315
Sean D. Ferrill, B.B.O. No. 654173
Attorneys for John J. Gentile
MARTIN, MAGNUSON, MCCARTHY & KENNEY
101 Merrimac Street
Boston, MA 02114
(617) 227-3240

Westlaw.

Not Reported in N.E.2d

Page 1

17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)

(Cite as: 2004 WL 875623 (Mass.Super.))

c

Superior Court of Massachusetts.
Richard **CAREY** & another [FN1]

FN1. Margaret **Carey**.

v.
NEW ENGLAND **ORGAN BANK** & others.
[FN2]

FN2. **New** England Eye & Tissue Transplant **Bank** and TBI/Tissue **Banks** International.

No. 02-602.

April 23, 2004.

*MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT*

DAVID A. LOWY, Justice.

### INTRODUCTION

*1 The plaintiffs, Richard and Margaret **Carey**, (collectively "the plaintiffs"), brought this action against **New** England **Organ Bank** ("NEOB"), and **New** England Eye and Tissue Transplant **Bank** ("NEETTB/TBI") [FN3], (collectively "the defendants"). The plaintiffs' action stems from the defendants' recovery of tissue from the body of Adam **Carey**, following his death on September 16, 2000. The plaintiffs, Adam's parents, consented to the donation, but claim the defendants acted negligently and not in good faith when soliciting their consent and harvesting Adam's tissue and **organs**. The harvested tissue could not be used for human transplantation, due to the lack of an adequate blood sample necessary for mandated testing. Count I alleges negligence; Count II alleges misrepresentation; Count III alleges tortious interference with a dead body; and Count IV alleges negligent infliction of emotional distress. This matter is now before the court on the defendants' Motion for Summary Judgment, or in the alternative, for Partial Summary Judgment. [FN4] For the reasons set forth below, the defendants' Motion for Summary Judgment is *ALLOWED*.

FN3. NEETTB is indistinct from Tissue Banks International, Inc., and both are referred to as NEETTB/TBI throughout this memorandum.

FN4. As an Alternative Motion for Partial Summary Judgment, the defendants claim that under G.L. c. 231, § 85K, their potential liability is limited to $20,000 because of their status as a charitable organization. The plaintiffs argue that a jury could find that the defendants were engaged in activities that were primarily commercial in nature and therefore are not entitled to the statutory cap. Since the defendants' Motion for Summary Judgment is allowed, the court does not address the applicability of G.L. c. 231, § 85K.

### BACKGROUND

The record discloses the following undisputed facts:

On September 16, 2000, Adam **Carey** was involved in an accident at the Kernwood Country Club in Beverly, Massachusetts. Adam received emergency treatment at the scene of the accident, and was then transported to North Shore Medical Center ("NSMC") in Salem, Massachusetts for emergency treatment. Adam received saline and other fluids as part of his emergency treatment. Adam was pronounced dead at 10:58 a.m. Jorge Duran, of the NEOB, spoke to Richard **Carey** about the option of donating Adam's tissue and **organs**. Richard **Carey** verbally consented to the recovery, while Tarah

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                              Page 2
17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)
(Cite as: 2004 WL 875623 (Mass.Super.))

Conaway of the NEOB, listened to both sides of the conversation. Jorge reduced Richard's verbal consent to writing on the "Recorded Telephone or Other Recorded Authorization" form and Tarah signed as a witness.

A donor's blood must undergo serologic testing to ensure that the donated organs or tissue are eligible for transplant. [FN5] A donor's blood cannot be accurately tested if it is hemodiluted from fluids received during medical treatment. To determine whether a donor's blood is hemodiluted, one must perform a calculation based on the amount of fluids received, time received, time of death, the donor's height, weight, and other factors. At the time the plaintiffs consented to donate Adam's organs and tissue, personnel from NEOB had collected some medical information from NSMC and decided to proceed with the recovery. It is unclear from the record exactly what information NSMC provided to NEOB. When viewing the evidence in the light most favorable to the plaintiffs the non-moving party, however, the record would support an inference that the defendants had all the information necessary (ie. Adam's weight, height, and infusion record) to make the hemodilution calculation at the time they decided to harvest Adam's organs. The plaintiffs do not allege that the defendants actually made this calculation first, and then disregarded it and proceeded with the recovery. The record does include a form entitled "Hemodilution/Blood Sample" which has Adam's hemodilution calculation, but does not indicate the time that this calculation was made. [FN6]

> FN5. The Food and Drug Administration mandates this serologic testing. See 42 C.F.R. 121.6; 21 C.F.R. 1270.21.

> FN6. The "Hemodilution/Blood Sample" form only includes the date that the blood sample was drawn, September 16, 2000 at 7:45pm, but does not indicate when the form was actually filled out.

*2 After NEOB obtained the plaintiffs' consent to donate certain organs and tissue from Adam's body, they contacted NEETTB/TBI. [FN7] On September 16, 2000, after Adam's death, staff from NEOB and NEETTB/TBI went to the Office of the Chief Medical Examiner and performed the recovery. Richard Luskin, Executive Director of NEOB, examined the documents that the NEOB recovery team reviewed before recovery, and testified that the documents did not contain any evidence that a hemodilution calculation was done. Tom Buckley, Executive Director of NEETTB testified that when his recovery team arrived at the Chief Medical Examiner's Office at approximately 9:00pm, Adam's medical chart was not available. Tom Buckley testified that NEETTB relied on NEOB's decision to proceed with recovery as evidence that the screening information NEOB obtained from NSMC indicated that Adam's organs and tissue could be transplanted.

> FN7. NEOB and NEETTB/TBI recover different tissue. For example NEOB recovered cardiovascular tissue and veins from Adam's body, and NEETTB/TBI recovered Adam's cornea and skin tissue.

After the recovery, the defendants determined that Adam's tissue could not be used for transplant due to hemodilution of Adam's blood and the resultant lack of an adequate blood sample. The defendants attempted to locate a pre-hemodilution blood sample from Adam, but were unsuccessful. On September 18, 2000, NEETTB/TBI completed a "In House Follow Up" form which indicates that Adam's blood sample was hemodiluted and that he was not a qualified donor. On September 19, 2000, NEOB made a notation on their "Tissue Donor Information Checklist" to discard Adam's organs and tissue. On October 4, 2000, NEETTB/TBI completed a "Record of Discard," documenting that Adam's recovered skin and corneas had been discarded.

Nonetheless, on October 9, 2000, NEETTB/TBI sent the plaintiffs a letter stating that the recovery was successful, and that one of Adam's corneas had been already transplanted. On November 10, 2000, NEOB sent plaintiffs a letter stating that recovery was successful and Adam's tissue remained in quarantine at that time. On March 19, 2001,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                                Page 3
17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)
(Cite as: 2004 WL 875623 (Mass.Super.))

NEETTB/TBI sent the plaintiffs another letter, explaining the administrative mistake that led to the erroneous information regarding the transplant of Adam's cornea. NEETTB/TBI apologized and explained that Adam's blood sample was hemodiluted and that therefore his donated organs and tissue could not be used for human transplant.

NEOB is a Massachusetts Corporation, organized under G.L. c. 180 as a charitable organization. NEOB is also qualified under Section 501(c)(3) of the Internal Revenue Code as a tax-exempt entity and under G.L. c. 64H §§ 6(d)-(e) as a tax-exempt purchaser. One of the stated purposes of NEOB is to "promote and implement the donation of human organs and tissue for transplantation and research." [FN8]

> FN8. NEOB's Restated Articles of Organization, Exhibit 9 to Defendants' Statement of Undisputed Facts and Legal Elements.

Tissue Banks International, Inc. ("TBI") was incorporated under the laws of Maryland and is recognized by the Secretary of the Commonwealth as qualified to perform services in Massachusetts. One of the stated purposes of TBI is "[t]o arrange for, and to direct, unify, stimulate, coordinate and further the work being done with respect to any and all types of tissue transplants." [FN9] TBI is recognized as a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code. New England Eye and Tissue Transplant Bank ("NEETTB") is a subsidiary organization of TBI. Employees working at NEETTB are employees of TBI. NEETTB does not have any bylaws, governing board or corporate structure separate from TBI, though NEETTB does maintain its own local organizational chart.

> FN9. Tissue Banks International, Inc.'s Articles of Organization, Exhibit 13 to Defendants' Statement of Undisputed Facts and Legal Element.

*3 During 2001, NEOB discontinued its distribution activities and transferred its remaining tissue inventory to LifeNet, a non-profit corporation, and therefore recognized a gain in 2001. The disclosure in the tax return also states that NEOB may recognize additional gains in 2002 and 2003 if certain conditions are met. NEOB sent all the tissue recovered from Adam to Cryolife, a for-profit company that converts recovered tissue into a transplantable form. Additionally, TBI has written agreements with several different for-profit tissue processors. These processing companies accept, process and distribute recovered tissue from TBI. TBI is reimbursed for their expenses and they charge a small fee.

## DISCUSSION
### I. Standard of Review

The court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Mass. R. Civ. P. 56(c); *Cassesso v. Comm' of Corr.*, 390 Mass. 419, 422 (1983); *Community Nat'l Bank v. Dawes*, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. *Pedersen v. Time, Inc.*, 404 Mass. 14, 17 (1989). The burden on the moving party may be satisfied either by submitting affirmative evidence that negates an essential element of the opposing party's case or by demonstrating "that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716 (1991)(approving the standard articulated in *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)). The court must consider the summary judgment material in a light most favorable to the non-moving party. See *Blare v. Husky Injection Molding Systems Boston Inc.*, 419 Mass. 437, 438 (1995).

### II. Good Faith and the Uniform Anatomical Gift Act

The plaintiffs claim that the defendants knew or should have known that Adam's blood was hemodiluted at the time of recovery, and that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                    Page 4
17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)
(Cite as: 2004 WL 875623 (Mass.Super.))

therefore Adam's organs and tissue could not be transplanted. The defendants claim that, absent bad faith, they are immune from suit under the Massachusetts' adoption of the Uniform Anatomical Gift Act ("UAGA"). The plaintiffs argue that immunity cannot be determined on summary judgment because there are genuine issues of material fact concerning the defendants' good faith and that where motive and intent are at issue, summary judgment is inappropriate.

In 1968 the Legislature promulgated the Federal Uniform Anatomical Gift Act. Twenty-nine states (plus the District of Columbia) adopted the 1968 act, including Massachusetts. Then in 1987, the Legislature promulgated a revised version of the act, which twenty-three states (plus the Virgin Islands) adopted. [FN10] In Massachusetts, the UAGA sets forth the methods for making an anatomical gift, the priority of people authorized to make such a gift, and the circumstances when such a gift is to be considered null and void. In addition, the UAGA provides that a person, including a corporation, agency, association or any other legal entity, acting "in good faith in accordance with the terms of [G.L. c. 113, §§ 7-13], or under the anatomical gift laws of another state or a foreign country shall not be liable for damages in any civil action or be subject to prosecution in any criminal proceeding." G.L. c. 113, § 13(c).

> FN10. Tennessee and Indiana adopted the basic format and many provisions of the 1968 Federal Uniform Anatomical Gift Act and then also adopted major provisions of the 1987 Federal Uniform Anatomical Gift Act. Accordingly, Tennessee and Indiana are considered to have adopted both the 1968 and 1987 act.

**A. Good Faith Can be Determined as a Matter of Law**

*4 The plaintiffs' first contend that good faith involves questions of fact, not to be resolved on summary judgment. The term "good faith" in the context of the UAGA has yet to be interpreted by either the Massachusetts' courts or Legislature.

However, at least eight other state and federal courts have addressed the meaning of good faith under the UAGA. See *Lyon v. U.S.*, 843 F.Supp. 531 (D .Minn.1994); *Perry*, 886 F.Supp. 1551; *Nicoletta v. Rochester Eye and Human Parts Bank*, 529 N.Y.S.2d 928 (N.Y.Sup., Sept. 18, 1978); *Kelly-Nevils v. Detroit Receiving Hosp.*, 536 N.W.2d 15 (Mich.App.1994); *Ramirez v. Health Partners of Southern Arizona*, 972 P.2d 658 (Ariz.App.Div.2, 1998); *Andrews v. Alabama Eye Bank*, 727 So.2d 62, 64- 65 (Ala.1999); *Rahman v. Mayo Clinic*, 578 N.W.2d 802 (Minn.App.1998); *Sattler v. Northwest Tissue Center*, 42 P.3d 440 (Wash.App.Div.1, 2002). All of these cases rely on the New York Supreme Court's initial interpretation in *Nicoletta*, 529 N.Y.S.2d 928.

The court in *Nicoletta* acknowledges that good faith is usually inappropriate for summary judgment because it involves a determination of intent, which is traditionally a question of fact for the jury. The common concept of good faith involves "dealings of a corporate or commercial nature, [where] there [are] no express or specific criteria of a statutory nature incorporating such a 'standard of conduct' against which an individual's conduct could be measured, without submitting evidence in the form of in-court testimony to a trier of fact." *Nicoletta*, 529 N.Y.S.2d at 1068. However, the court goes on to explain that good faith in the context of the UAGA is different. The court points out that:

> the Legislature has created an objective standard by which the good faith of a donee could be measured. The Uniform Anatomical Gift Act establishes a statutory scheme which outlines the means of effecting an anatomical gift, the classes of individuals entitled to effect such a gift, and the circumstances under which such a gift must be deemed null and void. None of the previous good-faith cases have involved such a definitive standard by which to judge a defendant's conduct.

*Id.* at 1069. The court in *Nicoletta* concluded that good faith could be determined as a matter of law and therefore could be an appropriate issue for summary judgment. See also *Brown v. Delaware Valley Transplant Program*, 615 A.2d 1379, 1384 (1992); and *Kelly-Nevils*, 526 N.W.2d at 19 (holding that "[u]nlike good-faith questions in cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)

(Cite as: 2004 WL 875623 (Mass.Super.))

Page 5

where the standards of conduct are not well-defined, and thus open to the conflicting opinions of reasonable persons, the UAGA provides objective standards against which a court may judge conduct.") The court in *Sattler,* points out that while it is possible for the court to resolve the issue of good faith on summary judgment, the court can only do so in the absence of genuine issues of material fact. *Sattler,* 42 P.3d at 445 (holding that since the parties put forth evidence of differing versions of the same consent conversation, a fact-finder was necessary to determine exactly who said what.)

*5 One of the main purposes of the UAGA is to provide uniformity in the application of organ donor law across the county. The prefatory note to the 1968 UAGA states that wherever it is adopted, "uncertainty as to the applicable law will be eliminated and all parties will be protected." UNIF. ANATOMICAL GIFT ACT U.L.A 8A (1968). When the UAGA was promulgated, "both the common law and the present statutory picture [was] one of confusion, diversity and inadequacy. This tend[ed] to discourage anatomical gifts and to create difficulties for physicians, especially for transplant surgeons." *Id.* The court in *Perry* explains that the "UAGA was in response to the need for more family donations of organs and to the medical professions' uncertainty about whose consent was needed for those donations." *Perry,* 886 F.Supp. at 1557. Since this court recognizes the need for uniformity and agrees with the reasoning that good faith immunity encourages organ donation, the court adopts the position that, absent disputed material facts, good faith can be determined as a matter of law.

**B. The Defendants Acted in Good Faith**
The court in *Nicoletta* defined the UAGA good faith requirement as an "honest belief, the absence of malice, and the absence of design to defraud or to seek an unconscionable advantage." *Nicoletta,* 519 N.Y.S.2d at 930 (citing *Black's Law Dictionary* (5th Ed.1979)). See also, *Rahman,* 578 N.W.2d at 805- 806 (holding that "[the plaintiff] failed to allege any facts that demonstrate that the clinic acted dishonestly, maliciously, fraudulently, or unconscionably"); *Perry,* 886 F.Supp. at 1558; *Lyon,* 843 F.Supp. at 533; *Kelly-Nevils,* 526 N.W.2d at 20. This court adopts the *Nicoletta* definition of good faith.

In this case, the plaintiffs assert that the defendants were not acting in good faith when they recovered tissue and organs from Adam, because the defendants (1) acted in violation of G.L. c. 113, § 8(b)(3) because they knew or should have known that Adam's tissue and organs could not be transplanted due to the hemodiluted blood sample; (2) failed to record adequately the consent conversation in accordance with G.L. c. 113, § 10(e); (3) mislead the plaintiffs with letters, erroneously reporting that Adam's cornea was successfully transplanted, when Adam's donated tissue and organs were actually discarded; and (4) have a relationship with for-profit processors of human tissue and such relationship served as improper motivation for harvesting Adam's organs and tissue.

**1. The Defendants' Failure to Perform Hemodilution Calculation**

Although the record is unclear as to exactly what information the defendants had before them at the time of their decision to proceed with recovery, this court considers the evidence in the light most favorable to the plaintiffs. The plaintiffs allege that at the time of recovery, the defendants had access to all the facts necessary to calculate whether Adam's blood was hemodiluted. The plaintiffs allege that the defendants acted without good faith because they were responsible for making the calculation, failed to do so, and recovered Adam's organs and tissue regardless. Richard Luskin, Executive Director of NEOB and Tom Buckley, Executive Director of NEETTB/TBI, testified that their recovery teams did not perform the hemodilution calculation before recovering Adam's tissue and organs. In light of the court's interpretation of good faith as an "honest belief, the absence of malice, and the absence of design to defraud or to seek an unconscionable advantage," this court does not find that the defendants' failure to do the hemodilution calculation constitutes lack of good faith when complying with the UAGA. *Nicoletta,* 519 N.Y.S.2d at 930.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                         Page 6

17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)

(Cite as: 2004 WL 875623 (Mass.Super.))

*6 First, the UAGA does not require donees to perform a hemodilution calculation before recovery. General Law, c. 113, § 13(c) states that "a person who acts in good faith in accordance with sections seven to thirteen, inclusive, or under the anatomical gift laws of another state ... shall not be liable for damages in any civil action...." The plaintiffs assert that the defendants' solicitation of the plaintiffs' consent to recover Adam's organs was not a good faith attempt to comply with G.L. c. 113, § 8(b)(3). Section 8(b)(3) states that "the director or other person in charge of such hospital, or his designated representative, including, but not limited to the physician responsible for the care of the patient shall inform" those on the decedent's statutory priority list "of the opportunity to authorize a gift of all or part of the decedent's body for purposes of organ and tissue transplantation ... provided, however, that ... consent to such transplantation would yield an organ or tissue donation suitable for use in accordance with medical criteria as defined by physicians engaged in clinical transplantation therapy...." Section 8(b)(3) is couched in directive language, not prohibitive, as it requires hospitals and/or treating physicians to inform the decedent's relatives of their option to donate the decedent's organs and tissue, when such organs and tissue qualify for transplant. The statute does not prohibit the hospital and/or physicians from informing the decedent's relatives of the opportunity to donate, when they are uncertain if the decedent's organs and tissue will qualify for transplant. In addition, section 8(b)(3) applies to hospitals and/or treating physicians, not to organ and tissue banks, such as the defendants. The court concludes that defendants' acts of obtaining consent for the recovery and conducting the actual recovery are not in violation of G.L. c. 113, § 8(b)(3).

Second, the record does not reflect any evidence that the defendants' actions were malicious, intended to defraud plaintiffs or an effort seek an unconscionable advantage. Indeed, in keeping with the purposes of NEOB and NEETTB/TBI, there is evidence that the defendants' actions were of a magnanimous and benevolent nature. The defendants are charitable, non-profit organizations, established for the purpose of facilitating successful organ donation and transplantation. Even if the defendants' failure to calculate Adam's hemodilution could be characterized as negligent, "[a] negligence standard is not used to determine whether good faith immunity will attach." Sattler, 42 P.3d at 444. Establishing lack of good faith requires more than a showing of mere negligence, lest the Legislature's intent to protect organizations enabling organ donation and transplantation, be frustrated. "Without the protection from liability provided by the good faith defense, procurement organizations would likely hesitate to seek needed donations." Id. at 442.

*7 If the defendants had made the hemodilution calculation, knew that Adam's blood was hemodiluted, and then proceeded with the recovery regardless, their actions would have more closely resembled a lack of good faith. However, the fact that Adam's blood was hemodiluted did not entirely preclude him as a donor; it only precluded his hemodiluted blood from adequate testing. There was the possibility that the hospital had drawn a sample of Adam's blood, pre-hemodilution, which could have been used for the mandated serological screening. Therefore, even if the defendants had performed the hemodilution calculation and proceeded with recovery, their actions might still have been in good faith since there was a possibility of obtaining a pre-hemodilution blood sample. It is undisputed that the defendants did attempt to locate such a sample, but did not succeed. The court concludes as a matter of law that the defendants' failure to calculate Adam's blood hemodilution does not indicate that the defendants' lacked good faith when complying with the UAGA.

**2. The Defendants' Failure to Tape-Record the Consent Conversation**

The plaintiffs claim that the defendants' failure to record adequately the consent conversation, in accordance with G.L. c. 113, § 10(e), evidences a lack of good faith when complying with the UAGA. General Laws c. 113, § 10(e) provides that "any gift by a person designated in subsection (b) of section eight shall be made by a document signed by him, or made by his telegraphic, recorded telephonic or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                         Page 7

17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)

(Cite as: 2004 WL 875623 (Mass.Super.))

other recorded message." The plaintiffs argue that the statute requires the consent conversation to be tape-recorded. However, according to the plain meaning of the statute, a tape-recording is not the only way to document consent; creation of some "other recorded message" is also adequate. G.L. c. 113, § 10(e). "Record" is defined as "an account made in an enduring form, especially in writing, that preserves the knowledge or memory of events or facts." *The American Heritage Dictionary,* William Morris, Ed. (1976). It is not clear that recording telephonic consent by reducing it to a writing, which is then signed by a witness, would not satisfy G.L. c. 113, § 10(e).

In this case, Jorge Duran obtained Richard Carey's verbal consent over the phone, while Tarah Conaway was listening to both sides of the conversation. Jorge reduced Richard's consent to writing on the "Recorded Telephone or Other Recorded Authorization" form, which Tarah signed as a witness. The court recognizes that there may by some question as to whether the defendants' documentation was in strict compliance with G.L. c. 113, § 10(e). However, the court does not need to resolve whether the defendants acted in strict compliance, only whether they acted in a good faith attempt to comply with the UAGA. The defendants' actions do not amount to malicious or unconscionable conduct, nor do they constitute a design to defraud the plaintiffs, and as such do not evidence a lack of good faith. Moreover, consent is not at issue in this case, as the plaintiffs admit that they verbally consented to the recovery of specified organs, bones and tissue from Adam's body. [FN11]

> FN11. See Plaintiffs' Rule 9A Response to the Defendants' Statement of Undisputed Facts and Legal Elements in Support of Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment, para. 6.

### 3. Defendants' Erroneous Letters

*8 Post recovery, the defendants sent the plaintiffs letters in which they reported that Adam's organs and tissue were either successfully transplanted, or in the process of being successfully transplanted. In truth, Adam's donated tissue and organs were discarded, due to his hemodiluted blood sample. The plaintiffs claim that these letters were deceitful and as such, evidence defendants' lack of good faith.

The plaintiffs assert that NETTB/TBI's October 9, 2000 letter announcing the successful transplant of Adam's cornea and NEOB's November 10, 2000 letter announcing that Adam's recovered organs and tissue were in quarantine, awaiting transplant, were evidence of the defendants' attempt to hide that they had wrongly solicited the plaintiffs' consent. However, the plaintiffs fail to address the letter dated March 19, 2001, in which TBI's executive director, Gerald J. Cole, and NEETTB's Executive Director, Tom Buckley, provided an extensive explanation of and apology for the administrative error which led to the erroneous information in the previous letters. The court finds that these communications between the defendants and the plaintiffs do not indicate the defendants' lacked good faith, when complying with the UAGA. The UAGA does not address a donee's post-recovery communications with the consenting family members. Given the defendants' charitable nature and purpose, their letter of apology and explanation, and the lack of any evidence of defendants' malice or intent to deceive, the misinformation in the letters can only be viewed as a painful administrative error. The court concludes that letters from the defendants to the plaintiffs are not evidence of the defendants' lack of good faith to comply with the UAGA.

### 4. The Defendants' Financial Relationships

Finally, the plaintiffs claim that the defendants' relationship with for-profit processors of human tissue served as improper motivation for harvesting Adam's organs and tissue. The record reflects that during 2001, NEOB discontinued its distribution activities and transferred its remaining tissue inventory to LifeNet, a non-profit corporation, and therefore recognized a gain in 2001. The disclosure in the tax return also states that NEOB may recognize additional gains in 2002 and 2003 if certain conditions are met. Presumably, plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d       Page 8

17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)

(Cite as: 2004 WL 875623 (Mass.Super.))

are attempting to argue that the defendants knew that Adam's tissue and organs were inadequate for transplant, but recovered them anyway to then "sell" to LifeNet for profit. However, there is no evidence linking NEOB's transaction with LifeNet, to NEOB's motivation for recovering Adam's organs and tissue. In fact the record contains documentation that both NEOB and NEETTB/TBI discarded Adam's tissue and organs, after finding they could not be used for human transplantation. [FN12]

> FN12. See Plaintiffs' Rule 9A Response to the Defendants' Statement of Undisputed Facts and Legal Elements in Support of Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment, Exhibit 17 & 18.

The plaintiffs also point out that both NEOB and TBI enjoy business relationships with for-profit tissue processors. However, the plaintiffs have failed to produce evidence that NEOB or TBI acted unconscionably in their relationship with these entities. The facts in this case must be viewed in a light most favorable to the plaintiffs, however, inferences must be based on something more than mere speculation and conjecture. *Federal Deposit Ins. Corp. v. Consignor,* 391 Mass. 737, 742-43 (1984). The court concludes that as a matter of law, the defendants' financial activities do not indicate that the defendants acted in the absence of good faith under the UAGA, when recovering tissue and organs from Adam's body.

**C. Policy Reasons for Broad Application of Good Faith Immunity Under the UAGA**

*9 Finally, this is a case in which public policy considerations behind the UAGA compel the court to find that good faith immunity applies. The Federal District Court in *Lyons* explains:

> The Uniform Anatomical Gift Act is clearly designed to balance two competing policy interests. There is the need for donations of eyes and other organs for transplantation and research purposes. Time is usually of the essence in securing donated organs at the time of the donor's death. The Act allows hospitals and physicians to ascertain with a high degree of certainty when someone is willing to donate organs, and to arrange for the prompt removal and preservation of donated organs. The Act also recognizes the religious and moral sensibilities of those who do not wish to donate organs. The Act does not compel organ donations nor does it establish a presumption that organs will be donated. The good faith exception to civil and criminal liability is designed for situations ... where because of confusion, an organ is removed without genuine consent.

*Lyons,* 843 F.Supp. at 536. Clearly, obtaining valid consent to donate, and abiding by any limitation to such consent is essential in maintaining the balance between facilitating organ donation and transplantation and respecting a family's wishes at the most difficult of times. Accordingly, previous cases discussing the UAGA good faith immunity provision, involves organ recovery absent genuine consent or beyond the scope of consent. In most of these cases, courts across jurisdictions have found that the UAGA good faith immunity applies and have granted or upheld summary judgment accordingly. See *Lyon,* 843 F.Supp. 531; *Nicoletta,* 529 N.Y.S .2d 928; *Kelly-Nevils,* 536 N.W.2d 15; *Ramirez,* 972 P.2d 658; *Andrews,* 727 So.2d 62; *Rahman,* 578 N.W.2d 802. The court denied summary judgment in two UAGA good faith immunity cases, not because of a lack of good faith, but because of conflicting statements of concerning consent, that needed to be resolved by a fact finder. See *Perry,* 886 F.Supp.1551; *Sattler,* 42 P.3d 440. The court in *Perry* explains that "[n]othing in its history suggests that UAGA was intended to cutoff liability when physicians or hospitals knowingly or recklessly mislead family donors and frustrate the donor's actual and expressed intent." *Perry,* 886 F.Supp. at 1559. Even when such a strong public interest is at issue, courts have applied the good faith immunity provision liberally, absent any evidence of intent to act against the known wishes of the plaintiffs, and absent disputes of material fact.

The dispute in this case involves the post-recovery discovery that the organs and tissue could not be transplanted. The court recognizes that the plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                 Page 9
17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)
(Cite as: 2004 WL 875623 (Mass.Super.))

made a decision to donate their son's organs while experiencing incalculable grief and that this pain could only have been exacerbated when they found out that their son's donated organs could not be used to improve another's life. And certainly, based upon the plaintiffs' evidence, the defendants should have exercised more care and consideration under these tragic circumstances. However, the plaintiffs did consent to donate various organs and tissue from Adam's body. Harvesting organs against a family's genuine intentions is more egregious than recovering organs with full consent, but failing to make necessary calculations to reveal that the organs are not qualified for transplant. Since courts have liberally upheld good faith immunity in the former instance, this court should extend good faith immunity in the latter.

*10 Time is of the essence during organ transplantation. If this court were to impose on organ banks and hospitals the requirement to perform various tests and calculations pre-recovery, to ensure that the organs are qualified for transplant, valuable time could be lost and the success of the entire transplant procedure jeopardized. Inevitably, in some instances the organ bank and/or hospital may not have access to the information necessary to make hemodilution calculations before recovery. Without the shield of good faith immunity, many doctors and organ bank officials would hesitate to recover organs that could later prove invaluable. A central purpose to the UAGA is to "encourage the making of anatomical gifts, thus facilitating therapy involving such procedures." Prefatory Note, UNIF. ANATOMICAL GIFT ACT U.L.A 8A (1968). If the court were to construe narrowly the application of the good faith immunity, that would only inhibit the successful recovery of anatomical gifts.

In addition, the plaintiffs must have realized that something could happen during the recovery process, the transportation and storage, or the transplantation procedure that would jeopardize the chances of Adam's donations being successfully transplanted. The UAGA "carefully weighs the numerous conflicting interests and legal problems" associated with the organ donation process.

Prefatory Note, UNIF. ANATOMICAL GIFT ACT U.L.A 8A (1968). In harmony with the UAGA's effort to balance competing interests, the court of course, realizes that the plaintiffs certainly suffered emotional pain when they learned that Adam's organs could not be transplanted. And one can only empathize with the torment they must now endure, knowing that their precious child's organs were discarded. The court, however, also recognizes the life threatening concerns of those awaiting transplant. When the plaintiffs consented to the donation, they were, in effect, consenting to allow the defendants the chance to use Adam's organs to help save or lengthen another's life. The legislature has balanced these frequently countervailing concerns by immunizing defendants from liability when they have satisfied the requirements of the UAGA, and made a good faith effort to recover and transplant a donor's organs and tissue. Given the overarching, vital public interest in facilitating organ and tissue donation, reflected in the UAGA, courts have allowed some leeway when construing the applicability of the UAGA's good faith immunity. The court finds as a matter of law the defendants did not act with malice, intent to deceive, or fraud, and as such did not lack good faith.

### CONCLUSION
The court finds that plaintiffs have failed to advance specific facts sufficient to establish the existence of a genuine issue of material fact as to the defendants' lack of good faith under UAGA. The court concludes, as a matter of law, that the defendants acted in good faith when recovering Adam's organs and tissue and as such are immune from all civil liability under the UAGA. Therefore, defendants' Motion for Summary Judgment is *ALLOWED.*

### ORDER
*11 For the foregoing reasons, it is therefore *ORDERED* that defendants New England Organ Bank and New England Eye & Tissue Transplant Bank/Tissue Bank International's Motion for Summary Judgment is *ALLOWED.*

17   Mass.L.Rptr.   582,   2004   WL   875623

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                 Page 10

17 Mass.L.Rptr. 582, 2004 WL 875623 (Mass.Super.)

**(Cite as: 2004 WL 875623 (Mass.Super.))**

(Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.