UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

CASE NO.: 05-11594 RCL
Honorable Reginald C. Lindsay

| | |
|---|---|
| GERALDINE FAVALORO, for herself and on behalf of all others similarly situated,<br>    Plaintiff, | )<br>)<br>)<br>) |
| vs. | )<br>) |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, BAYVIEW CREMATORY, LLC, a New Hampshire Limited Liability Company, LINDA STOKES, TRUSTEE OF THE DEKES REALTY TRUST OF 107 SOUTH BROADWAY, LAWRENCE, MASSACHUSETTS, and JOHN J. GENTILE,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT JOHN J. GENTILE'S OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS

Defendant, John J. Gentile ("Mr. Gentile"), by and through his undersigned counsel, Douglas A. Robertson, files this Opposition to Plaintiff Geraldine Favaloro's Motion for Attorney's Fees and Costs.

**The Favaloro Motion is Redundant and Premature**

The plaintiff, Geraldine Favaloro ("Ms. Favaloro") claims Mr. Gentile's Motion under Rule 11 was untimely, therefore, she should receive attorney's fees and costs. As Ms. Favaloro previously opposed Mr. Gentile's motion as untimely, her current motion is redundant. Her motion is also premature, as Mr. Gentile's motion is still under advisement.

## **The Gentile Rule 11 Motion Was Timely and Meritorious**

Mr. Gentile's Rule 11 Motion was timely and followed the procedural pathways for such motions as laid out in First Circuit case law. See Monahan Corp. v. Whitty, 319 F.Supp.2d 227, 232, 235 (D. Mass. 2004); 1993 Advisory Committee Note. Rule 11's requirement of "timeliness" has been interpreted to mean that a party seeking sanctions must serve its motion on the opposing party, and then may file the motion with the court 21 days later, only if the challenged pleading is neither withdrawn, or the offending party does not candidly acknowledge that it does not currently have evidence to support a specified allegation. See Id. at 233, 234; In re. M.A.S. Realty, Corp., 326 B.R. 31, 38 (Bkrtcy.D.Mass. 2005). In Monahan Corp., the defendant mailed the plaintiff their Rule 11 motion the day before the time to appeal expired. Id. at 235. The Monahan Court found such tactics too tricky by half, and ruled Rule 11 motions, timed to follow the expiration of the appeal period, would be untimely. Id.

In stark contrast, Ms. Favaloro's appellate rights are not yet foreclosed, indeed they have not yet matured, witness Ms. Favaloro's Proposed Findings for Entry of Separate and Final Judgment pending before the court [see Docket Entry 49]. Thus, the service of the Rule 11 motion on Mr. Charlip on May 16, 2006, and filing of the motion with the court 21 days later on June 12, 2006, was timely because we have yet to reach the "conclusion of the case." See Id. at 234; 1993 Advisory Committee Note. Indeed, Ms. Favaloro seeks Separate and Final Judgment, so that she can appeal the District Court's ruling that dismissal for lack of evidence pursuant to G.L. c. 113, §13 (c) is procedurally appropriate, and that the "good faith" immunity conveyed by G.L. c. 113, §13 (c) need not be held hostage to fruitless discovery, or only asserted through a Rule 56 summary judgment motion. In fact, if plaintiff were to prevail on appeal, she would then launch into discovery, without any evidence that Mr. Gentile ever acted in bad faith, in

essence bring us back to the inception of the case. Unless plaintiff amends her complaint to allege bad faith, something she has not done yet because her counsel has admitted he has no evidence of bad faith, Ms. Favaloro would be left pursuing her same negligence claim, a claim legally insufficient to clear the bad faith hurdle of G.L. c. 113, §13 (c). It would be truly "Alice through the looking glass" to view Mr. Gentile's pending motion as too late, even though, if the plaintiff were to prevail on appeal, the same motion would then be timely.

     Ms. Favaloro disingenuously casts her motion as procedural. This conveniently overlooks her stated intent to ask the First Circuit to reinstate her negligence claim against Mr. Gentile for purposes of discovery. It also ignores the fact that her negligence claim fails to state a cause of action given the immunity conveyed by G.L. c. 113, §13 (c). The purpose of Rule 11 is to deter frivolous litigation by burdening the party pressing the offending pleading with the full weight of her actions and to provide a disincentive for embarking on similar conduct in the future. See Fusco v. Medeiros, 965 F.Supp. 230, 236, 238 (D. R.I. 1996). Ms. Favaloro's continued pursuit of Mr. Gentile for alleged negligence is pointless, and she refuses to allege Mr. Gentile acted in bad faith, so as to state a claim under the Uniform Anatomical Gifts Act (UAGA), because plaintiff's counsel admitted to the Court at the December 19, 2005 motion to dismiss hearing that he has no good faith basis to allege Mr. Gentile acted in bad faith. (Transcript of hearing, Pg. 38-48, copy attached as ***Exhibit "A"***) Bordering on the Orwellian, even if Ms. Favaloro won, on appeal, reinstatement of her negligence claim, the negligence claim still fails to state a cause of action given the immunity conveyed by G. L. c. 113 § 13(c). Therefore, Mr. Gentile's Rule 11 motion was precisely in accord with the policy considerations underlying the Rule, discouraging Ms. Favaloro from continuing to pursue a claim which fails to

state a cause of action, and shifting the risk of continued financial harm from Mr. Gentile back to Ms. Favaloro. See Fusco, 965 F.Supp. at 237, 238; **Exhibit "A"**.

## CONCLUSION

For all of the above-stated reasons, defendant, John J. Gentile, respectfully requests that this Honorable Court deny plaintiff's motion for attorney's fees and costs.

        /s/   Douglas A. Robertson
        Douglas A. Robertson, B.B.O. No. 552315
        Attorney for John J. Gentile
        MARTIN, MAGNUSON, MCCARTHY &
           KENNEY
        101 Merrimac Street
        Boston, MA  02114
        (617) 227-3240

Dated:  August 21, 2006

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

GERALDINE FAVALORO,
        Plaintiff,        Civil Action No. 05-11594-RCL

V.                              December 19, 2005, 3:17 p.m.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, ET AL,
        Defendants.

TRANSCRIPT OF MOTION HEARING

BEFORE HONORABLE REGINALD C. LINDSAY

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

ONE COURTHOUSE WAY

BOSTON, MA   02210

DEBRA M. JOYCE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA   02210
617-737-4410

Page 2

```
 1  APPEARANCES:
 2  FOR THE PLAINTIFF:
 3  DAVID H. CHARLIP, ESQ
    Charlip Law Group, LC
 4  Harrison Executive Centre
    1930 Harrison Street, Suite 208
 5  Hollywood, FL 33020-5018
    954-921-2131
 6
    LISA DeBROSSE JOHNSON, ESQ
 7  The Pilot House
    Lewis Wharf
 8  Boston, MA 02110
    617-854-3743
 9
    FOR THE DEFENDANT HARVARD COLLEGE:
10
    EDWARD P LEIBENSPERGER, ESQ.
11  MELISSA L. NOTT, ESQ
    McDermott, Will & Emery
12  28 State Street
    Boston, MA 02109
13  617-535-4000
14  FOR DEFENDANT JOHN J. GENTILE:
15  DOUGLAS A. ROBERTSON, ESQ.
    Martin, Magnuson, McCarthy and Kenney
16  101 Merrimac Street
    Boston, MA 02114
17  617-227-3346
18  FOR DEFENDANTS BAYVIEW CREMATORY
    and LINDA STOKES:
19
    WILLIAM P SMITH, ESQ
20  Haverty & Feeney
    54 Samoset Street
21  Plymouth, MA 02360
    508-746-7067
22
    FOR BAYVIEW CREMATORY
23
    DONNA FEENEY, ESQ
24  Gelman, Stacey, Tamposi, Schulthess & Steere
    Three Executive Park Drive, Suite 9
25  Bedford, NH 03110
    603-626-3647
```

Page 3

1       PROCEEDINGS
2      (The following proceedings were held in open court
3  before the Honorable Reginald C Lindsay, United States
4  District Judge, United States District Court, District of
5  Massachusetts, at the John J. Moakley United States Courthouse,
6  1 Courthouse Way, Boston, Massachusetts, on December 19, 2005.)
7      THE CLERK: Civil action 05-11594, Geraldine
8  Favaloro v. Harvard College.
9      THE COURT: All right. Please, may I have
10 appearances?
11     MR. CHARLIP: David Charlip and Lisa Johnson for
12 the plaintiffs.
13     THE COURT: One more time?
14     MR. CHARLIP: David Charlip, Lisa Johnson for the
15 plaintiffs.
16     THE COURT: Thank you.
17     MR. ROBERTSON: Hi. If it please the Court. My
18 name is Doug Robertson. I'm from Martin Magnuson. I'm here
19 for Mr. Gentile.
20     MR. LEIBENSPERGER: Good afternoon. Edward
21 Leibensperger, Lisa Nott from William Emery for Harvard
22 University.
23     THE COURT: Do you see I have gotten you a
24 discovery master?
25     MR. LEIBENSPERGER: Yes, we saw the order. Thank

Page 4

1  you. Appreciate it, your Honor.
2      THE COURT: Okay.
3      MR. SMITH: Your Honor, William Smith. And I've
4  just filed my appearance today as co-counsel for Bayview
5  Crematory, LLC and Linda Stokes as Trustee.
6      THE COURT: Okay.
7      MS. FEENEY: Good afternoon, your Honor. Donna
8  Feeney as co-counsel for Bayview.
9      MR. AHERN: Good afternoon, your Honor. William
10 Ahern. I represent Linda Stokes as Trustee of Dekes Realty
11 Trust.
12     THE COURT: It's Ahern, is it?
13     MR. AHERN: Yes, your Honor.
14     THE COURT: I have two motions, one to remand and
15 one to dismiss. Do I not?
16     MR. LEIBENSPERGER: Your Honor, I believe you've
17 already decided the remand motion, denying it. So I believe
18 we're here on the motion to dismiss.
19     THE COURT: I did?
20     MR. LEIBENSPERGER: Yes.
21     THE COURT: When did I do that?
22     MR. LEIBENSPERGER: It's been at least a month.
23     MR. CHARLIP: There was an electronic order, but I
24 guess I didn't see a written order.
25     THE COURT: I guess I didn't intend to do one.

Page 5

1      MR. CHARLIP: That explains that.
2      THE COURT: If I intended to give you a written
3  order, I think I would have done it at the time I did the
4  electronic order, and the electronic order would be all I
5  intended.
6      Okay. Then I have the motion to dismiss.
7      MR. LEIBENSPERGER: Your Honor, you have motions to
8  dismiss, I believe, from each of the defendants; but on behalf
9  of Harvard, I'd like to start the argument.
10     THE COURT: Okay.
11     MR. LEIBENSPERGER: Your Honor, this case -- I'm
12 going to make three points as an outline and then come back;
13 but the three points are the following: Harvard is here as a
14 party to this case because in its medical school it runs an
15 Anatomical Gifts Program. And so this case is about the
16 application of the Uniform Anatomical Gifts Act in
17 Massachusetts, which Massachusetts has adopted, Chapter 113, to
18 Harvard's conduct of its Anatomical Gifts Program.
19     As your Honor knows, it arises out of a claim by
20 the plaintiffs -- on behalf of this plaintiff and a punitive
21 class of plaintiffs that remains of individuals who had donated
22 their bodies to Harvard Medical School when they were then sent
23 for cremation to Bayview Crematory in New Hampshire. There's
24 an allegation that those remains were mishandled and that
25 Bayview was unlicensed and so forth with respect to that.

Page 6

1    Now, Harvard's role in this, as I said, was to run
2    an Anatomical Gifts Program. It did so using bodies in
3    accordance with the donor's understanding, and done with use of
4    the body, turning it over, the body, to a licensed funeral
5    director, who then took the next steps with respect to
6    obtaining the cremation.
7        Once the cremation occurred, the ashes were brought
8    back to Harvard Medical School, and Harvard Medical School
9    delivered the ashes to the next of kin; in this case, the
10   plaintiff, Mrs. Favaloro.
11       The key here is -- for Harvard is that the
12   legislature recognized that anatomical gift programs were a
13   salutary program, and they wanted to encourage the donation of
14   bodies for medical research.
15       THE COURT: May I interrupt you for just a minute,
16   please? I'm sorry. It just occurs to me I -- if someone were
17   to remind me when we're done here, I will -- since the question
18   has been raised about -- it may have been raised why I denied
19   the motion to remand in the -- at least by implication since I
20   had not issued a written order, when we're done here today, I
21   can explain for the record why I did that. And if someone will
22   remind me, I'll try to at least state for the record in summary
23   form why I came to the conclusion I did with respect to the
24   motion to remand.
25       All right?

Page 7

1    MR. CHARLIP: Certainly.
2    THE COURT: Sorry, Mr. Leibensperger.
3    MR. LEIBENSPERGER: Thank you, your Honor.
4        So my three points, to be brief, are this is an
5    Anatomical Gifts Program run by Harvard, it's covered by the
6    Act. The Act specifically provides that conduct pursuant to
7    the Act is immune from civil liability --
8        THE COURT: Just a quick question about this. Is
9    the immunity question a defense to this claim?
10       MR. LEIBENSPERGER: Yes, your Honor. It could be
11   an affirmative defense.
12       THE COURT: If it is in truth an affirmative
13   defense, can I decide it on a motion to dismiss?
14       MR. LEIBENSPERGER: Yes, you can, your Honor. And
15   I can tell you why I say that and what cases would support
16   that.
17       THE COURT: Okay.
18       MR. LEIBENSPERGER: The main reason you can --
19   that's, actually, my second point here, is that the immunity
20   defense is in the statute. This case, this plaintiff does not
21   allege lack of good faith in her complaint. There's no
22   allegation of bad faith or lack of good faith in the
23   complaint. So the only case in Massachusetts that's addressed
24   this Act is the Carey v. New England Organ Bank case, which
25   held as a matter of law that the question of good faith under

Page 8

1    this statute is one that can be decided as a matter of law.
2        THE COURT: On a motion to dismiss?
3        MR. LEIBENSPERGER: Carey was on a motion for
4    summary judgment.
5        THE COURT: Right.
6        MR. LEIBENSPERGER: The distinction, though, is in
7    Carey the plaintiff pleaded bad faith. So it raised the issue.
8        THE COURT: Maybe it's not an affirmative defense.
9    Maybe it is that this a failure to state -- your claim is that
10   it's a failure to state a claim because it does not allege an
11   element; namely, bad faith.
12       MR. LEIBENSPERGER: It -- that is our argument,
13   your Honor, that they have to state a claim under each of the
14   elements of the statute.
15       Now, whether or not -- who has the burden to prove
16   good faith, I think, ultimately, if there were an allegation
17   and facts to support it, it would be on the defendant to prove
18   it.
19       THE COURT: The question I'm asking now is who has
20   the burden of pleading?
21       MR. LEIBENSPERGER: That's a different question,
22   and it's our position that the plaintiff has to at least plead
23   facts that would given rise to an inference of bad faith or it
24   could be construed as bad faith or lack of good faith.
25       Here, they knowingly didn't do that. They know

Page 9

1    what the statute says, and they couldn't plead anything about
2    bad faith or lack of good faith.
3        Now, there's -- I would refer to three other cases
4    with respect to your question about where we are in the
5    process. There's two cases, one from the 1st Circuit called
6    MacKnight that we've cited in our brief; that was a good
7    faith/bad faith case as it related to representation of the
8    employee by the union. And the court in MacKnight upheld the
9    dismissal of that case without allowing the plaintiff to take
10   discovery because the plaintiff couldn't allege enough facts to
11   get to discovery and to proceed through the case.
12       Now, technically I want to be clear that MacKnight
13   was on a summary judgment motion; but it was on a unique kind
14   of summary judgment motion before any discovery took place.
15   So, in essence, it was a motion to dismiss.
16       Another case that we've cited in our reply brief is
17   from the federal court in California in San Francisco, the
18   Northern District, and that's an anatomical gift programs case
19   in which the District Court moved or held that dismissal was
20   warranted on a Rule 12(b)(6) motion where the plaintiff could
21   not allege enough facts to suggest that the conduct of the
22   defendants was unreasonable, which was the word under the
23   California statute as opposed to good faith. So that case,
24   it's called Jacobsen v. Marin County Hospital, is directly on
25   point for a rule 12(b)(6) dismissal for failure to meet the

Page 10

1  elements of the statute. In that instance, reasonableness; in
2  ours, good faith/bad faith. In fact, I would say ours would be
3  even a higher level for the plaintiff to prove
4      THE COURT: Now, the plaintiff does allege that the
5  defendants, all of them, including Harvard, engaged in conduct
6  amounting to -- that would lead to a recovery if the plaintiff
7  were successful for the intentional infliction of emotional
8  distress in which the allegation is of outrageous or atrocious
9  or must be outrageous or atrocious conduct, conduct that no
10 person reasonably could endure.
11     Those allegations are made. Do they constitute --
12 are made against the defendants, including Harvard. Do those
13 constitute sufficient basis to infer lack of bad faith, giving
14 the plaintiff the benefit of inferences in her favor?
15     MR. LEIBENSPERGER: Your Honor, at some level, if
16 there were allegations of conduct that would be intentional
17 infliction of emotional distress, it may give rise to bad
18 faith. I could see your point with respect to that. But here
19 the allegations specifically against Harvard are that Harvard
20 failed to investigate what was going on at the crematory.
21 That's the all and end all of what the allegations are against
22 Harvard.
23     So I suggest to your Honor that that doesn't begin
24 to rise to the level of outrageous conduct that would support a
25 claim for intentional infliction; and likewise, wouldn't

Page 11

1  support a claim for bad faith.
2      The definitions are a little bit different. The
3  definition of bad faith under the Carey case, which was citing
4  a New York case, was -- is specifically good faith, is honest
5  belief, absence of malice and absence of fraud. So that's a
6  little different than what would be intentional infliction of
7  emotional distress. But I would recognize your Honor's point
8  that at some level, if there were facts that could be
9  intentional infliction of emotional distress, you could infer
10 bad faith.
11     They just don't exist here, particularly for
12 Harvard. I suggest they don't exist here for any of the
13 defendants, but particularly for Harvard, whose role is defined
14 in the complaint as the party who didn't investigate what was
15 going on at Bayview.
16     THE COURT: All right.
17     MR. LEIBENSPERGER: My third point, your Honor,
18 just to -- is that the plaintiffs in their brief I would say
19 implicitly concede that they don't have any evidence of bad
20 faith or any facts that would support bad faith because their
21 defense, their argument against this motion to dismiss is that
22 the statute doesn't apply. They say the statute doesn't apply
23 because this is not a consent case. And they argue that all
24 the cases under the Uniform Gift Act relate to when there's a
25 dispute about did the decedent or the decedent's family give

Page 12

1  consent?
2      Well, your Honor, if you look at the statute, it's
3  absolutely clear that under section 13(c) the immunity is
4  provided for all the acts that can take place with respect to
5  this program, including specifically the disposition of the
6  remains of the plaintiff.
7      So statute -- the statutory construction makes it
8  absolutely clear that it covers all cases, not just consent
9  cases; and, indeed, the Carey case, the only case in
10 Massachusetts, says explicitly it's not a consent case. It's
11 about what happened to the donated organs after consent was
12 already obtained.
13     And in that case the Court held that the good faith
14 immunity did apply, and that allegations of negligence were not
15 sufficient to get around that immunity
16     So, your Honor, the immunity -- the purpose of the
17 immunity is to prevent defendants from being dragged into court
18 when they're operating an Anatomical Gifts Program when there's
19 no evidence of any bad faith conduct and having to defend a
20 litigation.
21     For that reason, I suggest to your Honor that a
22 motion to dismiss is the most appropriate to rule on this
23 question before there is discovery and expense and time and
24 distraction from the Anatomical Gifts Program.
25     Thank you, your Honor.

Page 13

1      THE COURT: Okay. Mr. Robertson, you want to speak
2  to this question with respect to Mr. Gentile?
3      MR. ROBERTSON: I do. I won't be duplicative. If
4  you find me duplicative, you should cut me off, please.
5      THE COURT: You should have no doubt.
6      MR. ROBERTSON: Good. To try and answer a few of
7  your questions, we have a motion to dismiss, failure to state a
8  claim, count three. Count three is against Mr. Gentile. It
9  says you should have verified Bayview's business license.
10 There is no actionable tort called failure to verify the
11 existence of a business license
12     THE COURT: Isn't that simply a more descriptive
13 way of saying that you were negligent in checking on this?
14 Isn't that just what that means?
15     MR. ROBERTSON: It could mean that, but I think we
16 are entitled to know what it means. What it seems to allege --
17     THE COURT: Can I just decide that the allegation
18 of what you did or did not do is really sort of a statement of
19 where your negligence lies allegedly?
20     The complaint might have said failure to act
21 prudently or something like that in determining to give these
22 remains to Bayview or something like that. Instead, it says
23 failure to check. So it's more elaborate than it needs to be
24 in a notice pleading.
25     So let's assume that the allegation is of

Page 14

1  negligence. The question is: Does this immunity that Harvard
2  has talked about apply to Gentile as well?
3       MR. ROBERTSON: Of course it does, your Honor.
4  There's no question about that. In fact, the gravamen of the
5  complaint, the core of paragraph 42 of the complaint is -- the
6  core issue against Mr. Gentile is he didn't do enough to check
7  on the license or what was going on at Bayview.
8       Assuming that sounds in some broad stroke of
9  negligence, prudence, if you will, he's the link between
10 Anatomical Gifts Program, off the remains go, the remains come
11 back. The claim is, oh, when did people know and what did they
12 know? Well, the whole complaint says you didn't know enough
13 and you should have checked out and found out more
14      So then we get to the intentional tort allegations
15 in I think count four -- they can't be intent -- it's totally
16 inflicting. It's intentional implies that you knew something
17 and you didn't tell them or you kept something secret. But the
18 whole gravamen of the complaint against the defendants is you
19 didn't know enough. That --
20      THE COURT: You can allege inconsistent theories,
21 can you not?
22      MR. ROBERTSON: You can certainly allege
23 inconsistent theories, but since the allegations here, if taken
24 on their face for the purposes of a motion to dismiss, assume
25 it's true.

Page 15

1       Assume Mr. Gentile didn't know enough and he should
2  have known more. That puts him out of the box on the whole bad
3  faith issue. I mean, it can only be so inconsistent. Because
4  if we assume it's true for the purposes of the motion to
5  dismiss, they've disproved the rest of the case and they've
6  proven the application of the immunity.
7       There is no allegation here that Mr. Gentile in bad
8  faith or with knowledge that something was going on then failed
9  to inform the plaintiff or didn't do something to follow up.
10 It's that he was blithely ignorant of something.
11      So while you can be inconsistent, you can't have
12 your cake and eat it, too, which is what they've tried to do
13 here. And that's why it's a motion to dismiss.
14      THE COURT: All right. Thank you very much.
15      Does this immunity apply to Bayview as well?
16      MS. FEENEY: No, your Honor.
17      MR. AHERN: Not to Linda Stokes either, your Honor.
18      THE COURT: And to Linda Stokes. But you have a
19 motion to dismiss as well.
20      MS. FEENEY: That's correct, your Honor. We
21 joined, at least in part, with Harvard's motion to dismiss
22 limited exclusively to the dismissal of the negligent
23 infliction of emotional distress counts and the intentional
24 infliction of emotional distress counts as to Bayview. I think
25 they're pled as to all defendants counts four and five, your

Page 16

1  Honor.
2       THE COURT: And why do you say that the negligent
3  and intentional infliction counts should be dismissed except
4  that they are inconsistent?
5       MS. FEENEY: The inconsistency troubles me less
6  than the fact there's no factual basis or factual predicate for
7  the allegation of either one.
8       There's been no specific statement at all as to
9  what it was that was done. In other words, what the
10 mishandling, in fact, was that gave rise to the negligent or
11 the intentional infliction of emotional distress.
12      THE COURT: Does the plaintiff have to allege there
13 was anymore than a mishandling in the notice pleading
14 environment?
15      MS. FEENEY: I certainly appreciate the breadth of
16 the notice pleading, and the allegation of mishandling is fine;
17 but I think you do have to get more specific about what
18 precisely you claim mishandling was.
19      THE COURT: Why?
20      MS. FEENEY: What does mishandling mean, your
21 Honor? I don't mean to be rhetorical.
22      THE COURT: It's a fair question, but isn't that --
23 would you agree that if it were mishandled, if the remains were
24 mishandled in any way, it might lead to a -- you might have a
25 cause of action?

Page 17

1       MS. FEENEY: Sure.
2       THE COURT: So isn't that enough of an allegation
3  to survive a motion to dismiss if there was a mishandling,
4  careless mishandling of these remains? This is enough to
5  defeat a motion to dismiss?
6       MS. FEENEY: Not in the general sense, your Honor,
7  I don't agree. I think a mishandling has to be defined. It's
8  no different than saying we were negligent. Take out the word
9  "mishandling." We were negligent. In what way? What
10 specifically did we do, did Bayview do that was part and parcel
11 of a mishandling?
12      THE COURT: Back in, as they say, the day, when I
13 used to look at automobile torts, the automobile tort complaint
14 said that that X so negligently and carelessly drove his
15 automobile as to cause the plaintiff grievous injury, period.
16      MS. FEENEY: That's right.
17      THE COURT: Those cases all survived motions to
18 dismiss. In fact, nobody even brought a motion to dismiss.
19      MS. FEENEY: That's correct.
20      THE COURT: Isn't this like that?
21      MS. FEENEY: If I may make the distinction.
22      THE COURT: Please.
23      MS. FEENEY: You've raised the automobile
24 distinction. If you've driven -- in a long paragraph of the
25 complaint you've driven your vehicle in such a careless and

Page 18

1  negligent way so as to have caused a collision and to cause
2  injury to the plaintiff, I don't think any of us would disagree
3  that if there was no collision and no injury --
4      THE COURT: I didn't say "collision." I said so
5  negligently and carelessly drove his/her automobile so as to
6  cause the plaintiff injury.
7      MS. FEENEY: You're right, you don't have to have
8  collision to have injury. I could be carelessly driving, not
9  even impact your vehicle --
10     THE COURT: My point really is that that allegation
11 says no more than mishandling, does it?
12     MS. FEENEY: I think it does. I think it does. I
13 think when you say "mishandle," I say in what way? What did we
14 do? Who mishandled?
15     THE COURT: I'd like to know how you caused that
16 accident, particularly since the causing of the accident could
17 have happened in any number of ways.
18     MS. FEENEY: Sure, I could have cut you off.
19     THE COURT: Failure to a stop, you could have been
20 drunk. All kinds of things, just like this, mishandling.
21     MS. FEENEY: But mishandling to me is in such a
22 generic general sense. When we're talking about cremations,
23 what do you mean when you say "mishandling"?
24     THE COURT: What would you have the plaintiff
25 plead?

Page 19

1      MS. FEENEY: I'd like to know specifically what it
2  is they contend we did. Did we give you the wrong remains?
3  Did we treat the body of the decedent in some inappropriate
4  fashion? Were we disrespectful to the family? I think there's
5  a long laundry list. I'll take one.
6      THE COURT: Okay.
7  Anything else?
8      THE COURT: All right. Mr. Charlip, you may
9  respond to all of these.
10 First tell me is there any reason, any reason why
11 the plaintiffs, Harvard and Gentile, should not be dismissed?
12     MR. CHARLIP: There's a whole host of reasons.
13     THE COURT: All right. Give me that host.
14     MR. CHARLIP: Okay. First, if I could, I'd like to
15 lay a predicate.
16 In this case, my client did not deal with a funeral
17 home, she did not deal directly with Mr. Gentile. When her
18 mother passed away, it was her mother's donative wish to have
19 her remains go to Harvard for anatomical science.
20     THE COURT: I think I got that much.
21     MR. CHARLIP: So Harvard stands in the shoes of the
22 funeral home, as it were, in this case. They made certain
23 promises to her and her mother. They made certain
24 representations about what would be done with her body, how her
25 body would be treated.

Page 20

1      Harvard now claims, well, under the uniform -- the
2  UG --
3      THE COURT: Anatomical Gifts Act.
4      MR. CHARLIP: Anatomical Gifts Act they're immune.
5      As your Honor correctly recognized, that's a
6  defense. It's an affirmative defense --
7      THE COURT: I was hoping I wasn't recognizing it.
8  I was asking about it.
9      MR. CHARLIP: Well, I think were you correct in the
10 direction you were going; because the case law indicates that
11 that is, in fact, an affirmative defense, and it's
12 appropriate --
13     THE COURT: What if I put it to you that that
14 statute precludes any claim against somebody like Harvard or
15 Gentile unless you can launch -- the absence of bad faith --
16 that the statute says there is no claim against Harvard or
17 Gentile for negligence, for simple negligence. What if I put
18 that proposition to you? Would I be wrong?
19     MR. CHARLIP: I think what the statute indicates is
20 that there has to be some bad faith that if, in fact, Harvard
21 or Gentile -- and I think Gentile isn't immune under the
22 statute, but we'll leave that for a second -- that Harvard has
23 to allege and prove that it had an honest belief -- it's their
24 burden -- they had an honest belief that what they were doing
25 was correct.

Page 21

1      THE COURT: What do you say that Harvard did that
2  was not within the statute? You say you don't have to plead
3  that?
4      MR. CHARLIP: Well, I think what we pled evinces
5  the actions -- or describes the actions on the part of Harvard.
6      THE COURT: Failure to find out more about Bayview
7  and --
8      MR. CHARLIP: That they acted recklessly, they
9  acted with a careless disregard for my client's rights. They
10 made promises --
11     THE COURT: Those are easy things to say. You
12 know, there's this case where Judge Selya in his usual colorful
13 manner tells me that I don't have to -- even after the more
14 recent decisions of the Supreme Court about notice pleading, I
15 don't have to take bald assertions and what's that,
16 periphrastic circumlocutions I believe he said.
17 Do you know what that is? Do you know what
18 periphrastic circumlocutions is?
19     MR. CHARLIP: I have some idea.
20     THE COURT: Tell me.
21     MR. CHARLIP: I would submit to the Court that we
22 were direct in our pleading, and not only did we allege it in a
23 specific factual standpoint, we attached exhibits that further
24 bolster what we were saying.
25     THE COURT: What I hear -- what the complaint says

Page 22

1  is that Harvard neglected to look carefully to how the body
2  was -- or the remains were going to be disposed of.
3       MR. CHARLIP: I think the complaint goes a bit
4  further than that. What we're saying in the complaint is both
5  Gentile and Harvard either knew or should have known based on
6  the duties that they undertook that this operation --
7       THE COURT: If they knew -- excuse me, I don't mean
8  to interrupt you.
9       When you start out by saying they knew or should
10 have known, aren't you stating classic negligence construct?
11 Knew or should have known is negligence.
12      MR. CHARLIP: It's actually applicable to
13 recklessness.
14      The case law in this specific setting in the
15 mortuary setting, and particularly the case law that talks
16 about intentional infliction of emotional distress, talks about
17 weather the mortuary or the funeral home knew or should have
18 known that the conduct was going to cause the plaintiff severe
19 emotional distress --
20      THE COURT: But that's about the conduct. The
21 conduct has to be outrageous itself.
22      MR. CHARLIP: Right.
23      THE COURT: And I don't hear any outrageous conduct
24 on the part of Harvard and Gentile.
25      MR. CHARLIP: Well, as I started off saying,

Page 23

1  Harvard and Gentile stand in the shoes -- in effect, were the
2  funeral home here. There's a long line of cases --
3       THE COURT: You mean whatever mishandling, they did
4  it?
5       MR. CHARLIP: Yes. They're the funeral home. My
6  client didn't pick Bayview; my client didn't deal with Bayview;
7  my client didn't know from Bayview. They're the entities that
8  my client relied upon for the proper disposition of her
9  mother. And as I said, there's a long line of funeral home
10 cases in all -- just about every jurisdiction that says
11 mishandling of a body by a funeral director, by sending -- as
12 in the Tri-State case, when those funeral homes in the
13 Tri-State case, that's the case in Georgia where the crematory
14 ended up throwing the bodies in the back and the woodchuck --
15 you know, that type of situation.
16      THE COURT: Why isn't your client also liable then
17 if your client didn't check out Harvard and that Harvard was
18 doing these terrible things? Isn't it like Harvard not
19 checking out Gentile who didn't check out Bayview?
20      MR. CHARLIP: Well, my client had no basis to check
21 out Harvard. My Harvard --
22      THE COURT: That's what Harvard says. I didn't
23 have any basis to check out Gentile. He's a funeral director,
24 and reputable funeral director, so on.
25      MR. CHARLIP: The difference there is, first of

Page 24

1  all, Harvard made representations and promises to my client.
2  My client made no representations or promises to Harvard.
3       The second thing alleged in the complaint, that
4  Harvard undertook this duty voluntarily; but beyond that, the
5  statute itself, the UAGA places the duty on Harvard to follow
6  the wishes of the donor and the family and to -- and to do so
7  in a reverend fashion, as Harvard in their own pleadings -- I'm
8  sorry in, their own paperwork indicated they would do.
9       So in this particular case, Harvard undertook
10 certain duties. Gentile, although not directly to my clients,
11 undertook certain duties. He's a licensed funeral director.
12 By virtue of his license, he has the obligation to do certain
13 things and to act in a fashion that, number one, is not
14 negligent; and number two, is certainly not reckless.
15      THE COURT: What was reckless about this conduct?
16      MR. CHARLIP: This conduct was reckless because the
17 very first thing that someone in this situation should do is
18 make sure that the entity that they're dealing with is
19 approved, is licensed. Otherwise you're sending a body to the
20 barbecue house to be burned. It's the same thing. There's no
21 authority to do that which the state allows you and requires
22 you to do.
23      THE COURT: What distinguishes what you just said
24 from negligence?
25      MR. CHARLIP: What distinguishes it is the fact

Page 25

1  that -- well, there's two things. The first thing is we've
2  alleged this in a class action fashion. This is not a
3  situation where my client had a one-time error, and, oops, in
4  my client's case, Mrs. Favaloro's case, they sent the body to
5  Bayview; it shouldn't have gone there.
6       We allege in this class action complaint a course
7  of conduct that occurs over time again and again and again.
8       THE COURT: Gentile and Harvard sent several bodies
9  over and over again
10      MR. CHARLIP: In this complaint ten bodies at a
11 time with respect to Mrs. Favaloro's transport went to
12 Bayview. So just on that one trip there are ten bodies.
13 That's happened not one time, not two times, it occurred over
14 months and years.
15      So that's the first thing that takes it from a
16 situation where it's a oops, a one-time negligent mistake, to a
17 situation where we have a substantial and significant course of
18 conduct.
19      THE COURT: But you could have the same mistake
20 made 10, 12, 15, 16, 18, 20 times, couldn't you? Error.
21      MR. CHARLIP: At some point in time protestations
22 that you slipped up or this is one-time problem have to fall on
23 deaf ears.
24      THE COURT: Don't you have to tell me something
25 more that Harvard and Gentile didn't do, for example, something

Page 26

1  like they found out that these bodies were being mishandled
2  from whatever source and they continued to send bodies?
3      MR. CHARLIP: Well, there are a number of things --
4      THE COURT: Or that they had to deal -- every body
5  you send up here is a kickback or some such thing?
6      MR. CHARLIP: I think the only thing that notice
7  pleading requires us to do is to say they should have known. I
8  could tell you why they should have known.
9      THE COURT: If I say to you that's what you say, I
10 say all you've alleged is negligence
11     MR. CHARLIP: Well, if I were to tell you or if I
12 was to plead that because of the fact that Bayview was charging
13 well below what other crematories in the area were charging and
14 they were taking the bodies not here locally but going to New
15 Hampshire, that should have put Harvard and Gentile on notice
16 that something was amiss; or that because of the fact that
17 Massachusetts law requires a licensed funeral director to pick
18 up the body and to accompany the body on any transport, but in
19 this case a hurst would come or actually a truck would come to
20 pick up ten bodies at a time and not be accompanied by a
21 licensed funeral director. We can make those allegations, I
22 don't think we have to.
23     THE COURT: You didn't, did you?
24     MR. CHARLIP: No, we didn't. To that degree, we
25 didn't. But I think those are all subsumed under the

Page 27

1  allegation that Harvard or Gentile either knew or should have
2  known that dealing with Bayview was reckless because it was not
3  a licensed or approved facility and was handling bodies in a
4  manner that amounted to mishandling. I mean, that's the
5  essence of the allegation.
6      THE COURT: What do you say as to Bayview?
7      MR. CHARLIP: Bayview complains that we haven't
8  said the many ways in which they mishandled bodies. Again,
9  there's a litany of ranges of mishandling from the standpoint
10 of them not being licensed and approved from them transporting
11 bodies inappropriately and against the law, from them being
12 formed as part of a conspiracy to evade Massachusetts law. As
13 I say, there's a litany of ways that they mishandled these
14 bodies, and it's unfair for them to take the standpoint, well,
15 we know how we mishandled these bodies but because we prepared
16 fraudulent records, because we didn't provide records, because
17 we've done things that are both illegal, fraudulent, and
18 perjury, committed perjury in preparing records, we challenge
19 you to prove it and find it out.
20     THE COURT: I don't think that's what was said to
21 me this afternoon.
22     MR. CHARLIP: Well --
23     THE COURT: We know how we mishandled the bodies.
24 They said we don't know how. You say we mishandled the
25 bodies. That's what they told me today.

Page 28

1      MR. CHARLIP: Right.
2      THE COURT: Now, maybe they've said to you in the
3  quiet hallway out there we know how we mishandled the bodies
4  but you didn't say it in your complaint; but that's not what
5  was told to me this afternoon.
6      MR. CHARLIP: I understand that, and I don't think
7  that we need to go into the many ways that they mishandled
8  bodies. I think that certainly will come out in discovery.
9      I think we've indicated in the complaint that
10 they've mishandled bodies by not being licensed, by not being
11 approved, and by handling bodies in a manner -- I think we
12 actually went much further than saying mishandling alone.
13 We've actually said -- used the words the remains have not been
14 preserved as desired, that the remains were tainted and
15 contaminated, that the mishandling amounted to mutilation and
16 desecration.
17     So we've gone into more detail than just say, well,
18 the bodies were mishandled.
19     Once again, we're talking about class action
20 allegations; and so for us to, you know, give you a laundry
21 list of the different ways the bodies were mishandled at this
22 point I think goes well beyond notice pleading and goes well
23 beyond what our requirements are.
24     THE COURT: I don't know that Bayview made this
25 argument. I think Harvard and Gentile may have made the

Page 29

1  argument that you don't specifically say that the remains of
2  the plaintiff's decedent were mishandled, but that you use the
3  conjunctive and disjunctive in such a way that you may be
4  alleging that whatever happened to the remains of the
5  plaintiff's decedent there is a cause of action because
6  somebody in the class, the remains of someone, someone's
7  decedent in the class were mishandled.
8      MR. CHARLIP: I don't think that's what we pled.
9  My understanding is that the allegation is that Ms. Favaloro's
10 mother's remains were mishandled, and as class representative,
11 she is bringing a claim on her behalf and on behalf of all
12 other class members whose loved ones' remains were mishandled.
13 Mishandling being defined as those things I just mentioned,
14 desecration, contamination, tainting, mutilation. So those
15 allegations are, yes, general allegations; but our allegation
16 is that the remains of Favaloro's mother and the other remains
17 were mishandled.
18     THE COURT: Okay.
19     Anything else, counsel, any of you wish to say to
20 me?
21     MR. LEIBENSPERGER: Your Honor, this is a classic
22 case where you take the plaintiff's complaint and all
23 inferences that you can draw from it and all fairness to the
24 plaintiff at the pleading stage and it still doesn't amount to
25 anything more than a negligence claim against Harvard or even

Page 30

1  failure to comply with the statute, which Mr. Charlip was
2  referencing.
3         It's those claims that are protected by the
4  immunity; and, therefore, the case has to be dismissed against
5  Harvard.
6         And it's -- the cases that I referenced to your
7  Honor, the MacKnight case in particular, suggest where good
8  faith is involved in the matter, that there's no -- that
9  there's no reason to proceed to discovery unless the plaintiff
10 has some colorable claim that would give rise to an inference
11 of bad faith because, ultimately, that's the issue of the case
12 and it should not proceed unless the plaintiff has some
13 colorable basis for that claim of bad faith.
14        MR. ROBERTSON: Briefly, your Honor. We're in
15 federal court, everybody knows we have Rule 11, there's got to
16 be some basis for going forward here.
17        THE COURT: There's a Rule 11 in state court, too,
18 isn't there?
19        MR. ROBERTSON: There is. It has a little different
20 connotation in my experience. Here we are in federal court.
21 We've yet to hear, "They're not my mom's ashes; they're a
22 mixture of ashes." We've yet to hear anything that actually is
23 wrong about what happened. Be that as it may, we have you
24 should have known more. Anybody who went into the cafeteria
25 downstairs may not have checked for a creamery license, a food

Page 31

1  license or lots of licenses. Maybe they were negligent, but
2  were they extremely outrageous in their conduct as taking on
3  faith that a business was doing business and they had a
4  transaction?
5         Instead, what we hear is doing business with
6  somebody in New Hampshire is in itself sort of -- there's a
7  presumption of nefariousness. I don't get that. That doesn't
8  come out of any law that I know of. Nor the implication here
9  that there was a better price to be had in New Hampshire.
10 Saving a little money for a program like this to me doesn't
11 seem to involve any nefarious presumption.
12        Instead, where we are is in paragraph 42 of their
13 complaint it says, "The core issue which presents facts and law
14 that predominate over all issues was the failure to make even
15 the slightest investigation about Bayview's authorization to
16 conduct business as a crematory." That's the basis of
17 paragraph 42. That's negligence at its best. It's not bad
18 faith, it's not extreme and outrageous, it's not intentional
19 conduct.
20        So as to Mr. Gentile, I would submit that the
21 statutory provision providing for immunity is directly on
22 point; and the 1st Circuit in the case of Colonial Mortgage
23 Banking pointed out that litigants are not permitted to assert
24 contradictory positions to avoid dismissal.
25        They can't have their cake and eat it, too, here.

Page 32

1  They can't assert it's really a negligence case at its core
2  issue and then say, oops, maybe we missed, we really have this
3  bad faith case against Mr. Gentile.
4         Thank you, your Honor.
5         THE COURT: Okay.
6         Well, I'm prepared to rule on these motions having
7  heard the argument.
8         Taking Harvard's motion and the motion of Gentile
9  first, the provision in the Uniform Anatomical Gifts Act that
10 is at issue is section 13. This is Massachusetts General Laws
11 Chapter 113 section 13(c).
12        That statute reads, "A person who acts in good
13 faith in accordance with the terms of sections 7 to 13
14 inclusive or under the anatomical gift laws of another state or
15 a foreign country shall not be liable for damages in any civil
16 action or be subject to prosecution in any criminal proceeding
17 for his act.
18        First, let me point out that the immunity created
19 by this statute extends to a person, any person who acts in
20 good faith. That would cover Harvard and Gentile acting in
21 good faith. And what this statute does, as I read it, is to
22 immunize persons acting in good faith from any claim, except a
23 claim of -- that the conduct of the defendant was conduct in
24 bad faith. As such, the statute eliminates all causes of
25 action in which there is no allegation of bad faith or the

Page 33

1  absence of good faith.
2         So while my initial thought that maybe this is a
3  defense and that it can be raised as an affirmative defense, it
4  should not preclude the progress of this case in the face of a
5  motion to dismiss. I think that the statute properly read puts
6  the burden of pleading upon the plaintiff; that is to say, the
7  plaintiff must plead the absence of bad faith or lack of good
8  faith against parties that wanted to proceed.
9         And Mr. Robertson has put his finger on an
10 important -- and perhaps I think maybe Mr. Leibensperger did as
11 well -- the central allegation of the complaint as it relates
12 to Harvard and Gentile, and that's paragraph 42.
13        Paragraph 42 in full reads: "The unauthorized and
14 illegal operation of the Bayview Crematory, as well as its
15 improper, offensive, and mortifying method of operation,
16 together with its deficient and/or nonexistent recordkeeping
17 practice, as well as the failure of Harvard and Gentile even to
18 make the slightest investigation or determination of Bayview's
19 authorization to conduct business as a crematory, all resulted
20 in offensively irreverent disposition of the anatomical remains
21 of the class members' decedents/donors and resulting damage to
22 Ms. Favaloro and the members of the class. These are the core
23 issues in the case which present issues of fact and law that
24 predominant over all issues in this matter."
25        The core issues then as to Bayview, as I read this

Page 34

1  complaint, are that Bayview improperly and offensively operated
2  its crematory, had deficient and nonexistent recordkeeping
3  practices. There are other allegations, too, about Bayview
4  here; but as to Harvard and Gentile, the only allegation is
5  that they failed to make even the slightest investigation and
6  determination.
7       In this argument this afternoon Mr. Charlip
8  pronounced Harvard's -- the deficiencies of Harvard and Gentile
9  with the terms that they knew or should have known about
10 Bayview's operation. Again, the construct, the language of
11 negligence.
12      What is alleged in this complaint against Harvard
13 and Bayview (sic.) is nothing more than negligence, that they
14 failed fully to investigate the operations of Bayview
15      And because only negligence is alleged, lack of
16 good faith is not alleged, I think -- I rule -- not I think
17 that I rule, I mean I do rule that Harvard and Bayview (sic.)
18 are covered by section 13 -- excuse me, Harvard and Gentile --
19 excuse me, Harvard and Gentile are covered by Chapter 113
20 section 13(c) of the Uniformed Anatomical Gifts Act. And as to
21 Harvard and Gentile, the motion to dismiss is granted.
22      As to Bayview, however, the allegations are
23 broader, and read with all the inferences that are appropriate
24 to plaintiff I think they do -- these allegations allege bad
25 faith. Just as an example, I point to paragraph 36 of the

Page 35

1  complaint, which alleges the following: "Bayview's operation
2  in this crematory was not only unauthorized and illegal, and
3  unauthorized in this complaint means that there is not a
4  license," the complaint goes on, it was not in compliance,
5  "Bayview was not in compliance with and did not observe the
6  standards deemed ordinary and proper for the handling and
7  cremation of decedents. Particularly, Bayview performed
8  multiple cremations simultaneously, left bodies to decompose in
9  non-refrigerated containers, generally failed to properly
10 handle the bodies of decedents, and failed to prepare, keep,
11 and maintain accurate and proper records of its business. This
12 caused Bayview to return to Harvard, and ultimately the
13 families of Ms. Favaloro and other class members, tainted and
14 contaminated remains or remains that were not consistent with
15 the unique identity of the decedent/donor."
16      I think the complaint with that language reads
17 sufficiently to allege the absence of good faith, and the
18 parties have -- counsel for Bayview have acknowledged that the
19 immunity in this statute does not apply to the crematory in any
20 event.
21      So the motion of Bayview to dismiss this complaint
22 is denied.
23      Is there anything else I need to say?
24      Just one second.
25      (Discussion off the record.)

Page 36

1       THE COURT: I didn't ask about the trustee. Do you
2  want to say anything about the trustee?
3       MR. AHERN: Yes, your Honor. Our argument
4  basically mirrors that set forth in Harvard's brief, and which
5  you've already heard from Attorney Feeney. I don't think
6  there's a sufficient allegation that the trustee herself caused
7  any harm to the only named plaintiff in the case, Favaloro.
8       THE COURT: What does a trustee do?
9       MR. AHERN: The trustee is just the legal entity,
10 the person representing the legal entity that owned the
11 property at the time the complaint was filed, and she is the
12 mother of the owner of some of the funeral parlors in
13 Massachusetts.
14      THE COURT: So the allegation against the trustee
15 simply is that she owns the -- the only allegation against the
16 trustee is that she owned these properties?
17      MR. AHERN: The allegation is that she owned the
18 property. The trust owned the property, she's the trustee of
19 the trust, and that she somehow was involved with Bayview and
20 the operation, daily operation of the crematorium, your Honor.
21      THE COURT: Isn't that enough to keep the trustee
22 in?
23      MR. AHERN: My issue, again, is that I don't think
24 the complaint goes far enough to make a connection between the
25 only named defendant -- only named plaintiff and what the

Page 37

1  trustee did or didn't do.
2       THE COURT: What do you say about that,
3  Mr. Charlip?
4       MR. CHARLIP: Paragraph 32, we allege that "Stokes
5  was fully cognizant and aware of the fact that Bayview was not
6  a state authorized and approved crematory in the State of New
7  Hampshire and had no official authority to conduct business
8  cremating the remains of decedents under any rule" --
9       THE COURT: Slowly.
10      MR. CHARLIP: I'm sorry. -- "under any rule,
11 regulation, statute or ordinance of any state of the United
12 States of America."
13      Further, we say, "Stokes was fully cognizant and
14 aware that Bayview Crematory had no authority or approval to
15 conduct business in this Commonwealth but had and maintained
16 business relations with funeral homes and funeral directors,
17 including Gentile. Stokes permitted Bayview to operate --
18 improperly operate its unauthorized and unapproved business
19 with full knowledge of the foreseeable consequences and likely
20 effect on Favaloro and the class."
21      So I think that paragraph -- there's some other
22 paragraphs, but I think that paragraph ties in Stokes to the
23 conduct.
24      THE COURT: Yes, sir.
25      MR. AHERN: Your Honor, I think it's a pretty weak

Page 38

1  broth. I don't think there's enough there to show that Stokes
2  did anything that effected Favaloro. The fact that either
3  there was or there wasn't a license, how did that effect
4  Favaloro or any of these purported class members?
5      THE COURT: Well, the allegation is that Favaloro's
6  body was mishandled and that the mishandling occurred because
7  there was a generalized failure to observe even the minimal
8  standards of a crematory, and that Stokes knew all that was
9  happening and permitted it to happen on her property. That's
10 the allegation as I hear it.
11     It seems to me that's enough to survive this
12 motion. It may not be enough at the end of the day. I leave
13 that to discovery, but to survive this motion that's enough.
14     The motion of Stokes to dismiss is denied.
15     Yes, sir.
16     MR. CHARLIP: As to Harvard and Gentile, is the
17 granting of the motion to dismiss with or without prejudice?
18     THE COURT: Well, do you say that you can make
19 allegations that are sufficient to show that they are not
20 immune under the Uniform Anatomical Gifts Act?
21     MR. CHARLIP: Well, my concern, your Honor, is I
22 listed a bunch of things that I did not specifically plead in
23 answer to some of your Honor's questions here today.
24     THE COURT: Well, as Mr. Robertson points out, if
25 those things were alleged, that still would not make out a

Page 39

1  case, in my view, of bad faith.
2      What you allege, what you said is that there are
3  lots of things that should have put Gentile, at least, and I'm
4  not sure about Harvard, but Gentile on notice of something
5  wrong at Bayview. They were cheap, they operated out of state,
6  there were a couple of other things. It seems to me that those
7  allegations simply show that there were things that should have
8  put Gentile on notice. Those are the kinds of things that you
9  talk about when you say should have known.
10     MR. CHARLIP: Well, those are both elements of why
11 both Harvard and Gentile should have known, but there are also
12 actionable elements constituting mishandling. For example, if
13 you are a funeral director, as Gentile was, or a funeral home,
14 as Harvard was standing in the shoes of being, you know that
15 it's improper in the State of Massachusetts to be transporting
16 bodies by an unlicensed person. So if Harvard gives bodies and
17 Gentile gives bodies to an unlicensed person, they're
18 committing the act of mishandling themselves, that they're
19 knowingly committing the act of mishandling.
20     And if the standard is that you check on things
21 like that, you don't just willy-nilly give bodies to people who
22 show up and say I'm from Bayview, then, in fact, that's
23 evidence of knowing mishandling.
24     So, yes, we could have gone into more detail about
25 what happened along the way with these bodies and this whole

Page 40

1  plan to evade the laws of the State of Massachusetts that
2  Harvard either knew or should have known about as Gentile
3  should have -- knew or should have known about.
4      THE COURT: When was this motion to dismiss filed?
5      MR. LEIBENSPERGER: In August, your Honor.
6      MR. ROBERTSON: I served upon them August 16th.
7      THE COURT: That's when you served your response?
8      MR. ROBERTSON: that's when I served my motion.
9      THE COURT: That's when you -- I'm sorry, that's
10 when you served your motion.
11     MR. ROBERTSON: August. Now we're at Christmas.
12     THE COURT: I always take -- I guess I take the
13 position as a general matter that when the papers are filed and
14 deficiencies stated, as a general matter that's the time to
15 think about what amendments you can make.
16     Now, the rule says even after I rule on this you
17 can -- if I allow you, you can amend. But it strikes me that
18 what Mr. Leibensperger said earlier in his argument is that
19 there was some recognition or at least that you hadn't alleged
20 enough to get past the immunity, but you alleged ultimately --
21 that your argument principally was that it didn't apply to
22 these folks.
23     MR. CHARLIP: That's not correct. Our argument is
24 and has been that this is an issue that really is more properly
25 brought by way of summary judgment. It's kind of difficult to

Page 41

1  allege or say who has an honest good faith belief on the part
2  of Harvard if we don't even know who the actors are or what
3  their contentions are. That's why the cases that we cited
4  indicate that this is not a matter for a motion to dismiss, but
5  instead a matter for summary judgment. And only if the facts
6  are undisputed. But your Honor has ruled --
7      THE COURT: Let's just make sure I understand. You
8  want to amend the complaint to say that Harvard and Gentile
9  were aware that, A, it was illegal to transport bodies outside
10 the state for disposition --
11     MR. CHARLIP: No, no, that's not correct.
12     What I'm suggesting is that the evidence that we're
13 aware of now reflects that the person working for Bayview and
14 that would come and pick up these bodies was not a licensed
15 individual as he was required to be under Massachusetts law.
16     THE COURT: Yes. And are you saying they knew
17 that, Harvard knew that?
18     MR. CHARLIP: They either knew it or should have
19 known it.
20     THE COURT: That's where we are now. They knew or
21 should have known. It seems to me if you're going to allege
22 bad faith, you've got to say they knew it, that they gave those
23 bodies notwithstanding that they knew it.
24     MR. CHARLIP: With all due respect, Judge, I think
25 that's not a correct statement of the law

Page 42

1  THE COURT: All right. It's going to be the state
2  of law that governs this case until it gets to the 1st Circuit.
3  MR. CHARLIP: Well, then beyond that, to answer
4  your Honor's question, I don't think we can say they
5  affirmatively knew what they were doing was wrong and they did
6  it anyway.
7  THE COURT: Well, that seems to me -- I know you
8  disagree with it, but that seems to me an allegation of bad
9  faith. To say that they knew or should have known is an
10 allegation, it seems to me it's almost a paradigm of
11 negligence. One knows or should have known.
12 MR. CHARLIP: But, your Honor, if I could respond
13 to that --
14 THE COURT: All right. But I've heard this.
15 MR. CHARLIP: Well, this is a bit different.
16 What I hear the defendant saying, I think what
17 their argument is and what concerns me about your ruling is the
18 following: If what they're saying is true, they can take the
19 ostrich with his head in the sand approach.
20 THE COURT: But that's different, that's different.
21 MR. CHARLIP: But that's should have known.
22 THE COURT: No, no, if you're saying they were
23 willfully, willfully without knowledge, that's a different --
24 MR. CHARLIP: That's what we're saying.
25 THE COURT: This is the very first time I heard you

Page 43

1  say they were willfully blind. You have said before -- and I
2  don't want to help you out here because I've already made my --
3  ruling, you have said they knew or should have known. You
4  didn't say that they were willfully blind, that they -- there
5  were circumstances -- and this is what willful blindness
6  means -- there were circumstances all around that pointed to
7  the fact that these people were operating an unlicensed
8  facility, all around, and these people, Harvard and Gentile,
9  simply closed their eyes to some realities that open eyes would
10 have found. That's what you have said.
11 MR. CHARLIP: That is the essence of what I thought
12 we pled; but I'm certainly saying that here, that anyone who
13 wanted to know, who had a desire to know would have known.
14 THE COURT: That's different.
15 MR. CHARLIP: They willfully closed their eyes to
16 this so they could take the position if they were ever sued I
17 didn't act in bad faith. I didn't know. You can't do that.
18 THE COURT: I think I made my ruling. We're going
19 in circles, because when I state the problem of willful
20 blindness, I'm talking about -- the concept of willful
21 blindness is an actual substitute for actual knowledge. It
22 says that these parties, Harvard and Gentile, say I don't know
23 and I don't want to know, and notwithstanding the fact that
24 there were all of these circumstances surrounding them, the guy
25 shows up and says, you know, if you look in my truck you'll

Page 44

1  find that I don't have a license up there, and Harvard says,
2  oh, no, I don't want to look in there, and Gentile says I don't
3  want to look in your truck. That kind of circumstance is an
4  absence of good faith.
5  It isn't the same thing as saying they should have
6  known. That means if they had taken the time to investigate
7  it, they should have done, they would have found out. Not that
8  there were circumstances staring them in the face which they
9  closed their eyes to. That's what I understand willful
10 blindness to mean.
11 I ruled, I'm done. Thank you very much.
12 MR. CHARLIP: My question, Judge, I'm not sure you
13 answered so I could have a clarification, did you rule that
14 they were dismissed with or without prejudice? That was my
15 question.
16 We would like the opportunity to prove what your
17 Honor just said. I'm just asking whether you'll give us that.
18 THE COURT: So you're asking for leave to amend the
19 complaint?
20 MR. CHARLIP: Correct.
21 THE COURT: What do you say, Mr. Leibensperger?
22 MR. LEIBENSPERGER: Well, we would object to that.
23 That's exactly the point that the immunity statute is intended
24 to do, is to prevent this sort of fishing expedition for facts
25 that the plaintiff doesn't have or doesn't even have a good

Page 45

1  faith ground to assert.
2  I mean, he has Rule 11 obligations. He brought
3  this complaint, he's seen this motion to dismiss now for
4  four-plus months, and now even allegations that I'm hearing
5  that he might want to assert starting to really sound like in
6  negligence anyway.
7  So for example, if we got a motion to amend
8  tomorrow I'm sure that we'd oppose it on the ground that it was
9  futile and it ought not to be allowed.
10 So I would oppose.
11 THE COURT: Let me suggest to you, if I allow this
12 motion and if it's nothing more than negligence, you have your
13 Rule 11 motion. What has been presented to me, is there is a
14 basis for alleging more than negligence here, and we've had a
15 long discussion of what I view is negligence. We have a
16 disagreement about negligence, because I say if the allegation
17 is they knew or should have known, it's negligence.
18 The allegation that I hear that Mr. Charlip is
19 talking about now is that something amounting to bad faith
20 failure when it was obvious what was going on.
21 And I gave the example that there's a license --
22 the guy says look in my truck before you give me these bodies
23 and you'll find something that may stop you from giving me
24 these bodies, and these parties say I don't want to do that
25 because I don't want to know anything. That's what I'm talking

Page 46

1  about. Allegations along those lines.
2  Now, if you've got something like that and you
3  think you in good faith can make that allegation, then you
4  ought to do it, but if it's just negligence -- you understand
5  that I will not -- I don't want to look at this again if all
6  you're going to tell me is negligence.
7  And what is it you're going to say? Tell me --
8  maybe I should know what it is you're going to allege.
9  MR. CHARLIP: Well, I think what we would allege
10  would be along the lines -- and obviously I can't give you
11  chapter and verse right now --
12  THE COURT: No, no, you should be able to, because
13  you say you want me to not dismiss, give you a chance to
14  amend. That means you know right now what it is you'll say.
15  So tell me.
16  MR. CHARLIP: That there were funeral homes -- I'm
17  sorry, that there were crematories in the State of
18  Massachusetts that under Massachusetts law had to be owned by
19  someone other than a funeral home owner, that it was against
20  Massachusetts law to own a funeral home and a crematory, that
21  it was well-known in the industry that Derek Wallace was a
22  funeral home owner and owned two funeral homes and that he
23  formed Bayview in New Hampshire to evade the requirements of
24  Massachusetts law, that Bayview was charging --
25  THE COURT: And that Harvard and Gentile knew all

Page 47

1  of this.
2  MR. CHARLIP: Yes.
3  THE COURT: They knew.
4  MR. CHARLIP: It was known in the industry --
5  THE COURT: Excuse me, that Bayview (sic.) and
6  Harvard knew, not known in the industry. That these parties
7  knew -- if they did not know but should have known but was
8  known in the industry, that's negligence again.
9  But the allegation is that somebody formed a
10  crematory in New Hampshire to avoid Massachusetts law and
11  Harvard and Gentile knew that. Now, are you prepared to allege
12  that?
13  MR. CHARLIP: I have not deposed Harvard, I have
14  not deposed Gentile --
15  THE COURT: No, no. At this point can you allege
16  it in good faith? Not that it's known in the industry, because
17  as I say, knowing in the industry means simply -- it may have a
18  different impact on Gentile, but Harvard is not in this
19  industry.
20  MR. CHARLIP: I would submit that Harvard's
21  donative body program acts in the stead of a funeral home.
22  They do -- they do contract --
23  THE COURT: You know, you're talking a legal
24  construct. The question is did Harvard act in bad faith? And
25  bad faith means that they did something knowing the things

Page 48

1  you're just alleging. Harvard knew all of this.
2  MR. CHARLIP: I don't know what Harvard knew as I
3  stand here right now.
4  THE COURT: Okay. I think I'm done.
5  The motion to dismiss is with prejudice.
6  MR. CHARLIP: Okay.
7  THE COURT: The granting of the motion to dismiss
8  is with prejudice.
9  MR. CHARLIP: Your Honor, I rise only to remind you
10  you asked us to remind you --
11  THE COURT: Thank you very much.
12  On the motion to remand, I have apparently already
13  granted (sic) that motion, and there are two exceptions to the
14  removal of this case: The local controversy exception and the
15  home state exception.
16  The local controversy exception fails because no
17  other class action was filed within the three-year period
18  within which this action was filed; and there are at least
19  four, I have another one, at least one of them, maybe there are
20  two other ones. How many?
21  MS. FEENEY: Two.
22  MR. AHERN: Two, your Honor.
23  THE COURT: I have two other class actions. And
24  those class actions make the same or similar allegations
25  against at least some of the defendants as is made in this

Page 49

1  case.
2  The home state exception reads that two-thirds or
3  more of the members of all proposed plaintiff classes in the
4  aggregate and the primary defendants are citizens of the state
5  in which the action was originally filed. And the primary
6  defendants are not citizens of Massachusetts. Bayview being
7  the primary -- and Stokes the primary defendants, they're all
8  citizens of New Hampshire
9  Now, there's some notion that Harvard and Gentile
10  are the primary defendants, but the primary action alleged in
11  this is the action of Bayview, and besides which, I've
12  dismissed the other two defendants.
13  (Discussion off the record.)
14  THE COURT: I'm reminded I'm using the wrong phrase
15  as between granted and dismissed -- granted and denied.
16  The motion to remand has been denied, and is denied
17  for those reasons.
18  Okay. Anything further?
19  MR. LEIBENSPERGER: Thank you, your Honor.
20  THE COURT: If I had to write this all down, I can
21  get it straight, but since I'm -- I'm doing it from the bench
22  to get it done quickly, I need someone to remind me if I say
23  granted when I mean denied, in particular.
24  Okay. Just to clear things up, the motion to
25  dismiss is granted in as far as it is a motion of Harvard and

13 (Pages 46 to 49)

Favaloro v. Harvard, et al, 12/19/05 hearing

8818be72-163a-4f5f-a160-da47a906b8b2

Page 50

1   Gentile and is denied in as far as it is a motion of Bayview
2   and Stokes
3       The motion to remand I've already denied
4       Thank you
5       (Court adjourned at 4:31 p.m.)
6           ||||||
7           CERTIFICATION
8       I certify that the foregoing is a correct
9   transcript of the record of proceedings in the above-entitled
10  matter to the best of my skill and ability
11
12
13
14  _____    _____
15  Debra M. Joyce             Date
16  Official Court Reporter